CARLOS MARTÍNEZ CRUZ, ETC., demandantes y recurrentes, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO, ETC., demandados y recurridos.

Número: RE-90-153      Resuelto: 24 de abril de 1990

*Héctor M. Collazo*, abogado de los recurrentes; la parte recurrida no compareció.

## RESOLUCIÓN

A la anterior solicitud de revisión, no ha lugar.

Lo acordó el Tribunal y certifica el señor Secretario General. El Juez Asociado Señor Negrón García emitió voto disidente. El

Juez Asociado Señor Ortiz y la Juez Asociada Señora Naveira de Rodón no intervinieron.

(*Fdo.*) Francisco R. Agrait Lladó
Secretario General

—O—

Voto disidente del Juez Asociado Señor Negrón García.

Disentimos de la negativa del Tribunal a expedir y revocar la sentencia del Tribunal Superior, Sala de Mayagüez (Hon. Hiram A. Sánchez Martínez, Juez), que declaró sin lugar la reclamación en daños por impericia profesional instada por el viudo, los hijos, los padres y los hermanos de Josefina Martínez Vélez, quien falleció en el Centro Médico de Mayagüez como consecuencia de una intervención quirúrgica practicada a base de un diagnóstico equivocado.

I

Expongamos capsularmente el trasfondo fáctico originario de este lamentable drama. Como veremos, al levantarse el telón —más que normas jurídicas frías— aparece la dolorosa realidad de aquello que todo el mundo sabe pero que intenta ignorar: las diferencias entre la medicina pública para los pobres y la privada.

El 9 de agosto de 1982 la señora Martínez Vélez, joven de veintiséis (26) años, acudió a la Sala de Emergencia del Hospital Municipal San Antonio de Mayagüez. Se quejó de haber sufrido malestar y debilidad general durante los seis (6) días anteriores y fiebre alta ese día. Le fue diagnosticado un síndrome viral y *deshidratación.* Se registró, además, *que su corazón estaba en buen estado, sin soplo y sus pulmones claros.* Una prueba de embarazo resultó negativa. Cuatro (4) horas y media más tarde, luego de hidratársele completamente, fue dada de alta.

A la mañana *siguiente* la señora Martínez Vélez regresó al hospital. Entre las 10:10 A.M. y 11:15 A.M. se quejó de episodios de vómitos, malestar general y mareos. Indicó haberlos tenido

durante la última semana. Su presión sistólica había bajado a menos de ochenta (80) y estaba taquicárdica. Sus pulmones estaban claros y su abdomen blando y oprimible. *Nuevamente*, el diagnóstico fue síndrome viral y deshidratación. Se ordenaron exámenes de hemoglobina y hematocrito e infusión de líquidos. A las 11:45 A.M. se instruyó que le tomaran la presión sanguínea hasta que se elevara a cien (100).

A las 2:30 P.M. los médicos anotaron la dificultad para aumentar la presión sanguínea, a pesar de los 2,500 mililitros de líquido administrados. La evaluación pélvica reveló un cuello cervical cerrado y sangre coagulada en la vagina de color café molido. Su hemoglobina disminuyó de dieciséis (16) a trece (13) gramos.

El médico del referido hospital municipal anotó tener dudas sobre la etiología de la hipotensión. Señaló que debería considerarse un embarazo ectópico a pesar de que la paciente indicaba que había concluido su período menstrual recientemente.[1] A las 3:15 P.M. fue referida al Centro Médico de Mayagüez.

Al arribar a la Sala de Emergencia del mencionado Centro Médico, la paciente presentaba taquicardia, hipotensión, cianosis periferal y dolor en el abdomen bajo. A las 4:45 P.M. una RESIDENTE de ginecología le practicó otro examen físico que reveló un cuello cervical rosado oscuro y flujo vaginal sanguinolento. La palpación del útero presentaba tamaño similar al de un embarazo de ocho (8) a diez (10) semanas de gestación.

Se le practicó una culdocentesis,[2] y se obtuvo líquido sanguinolento del fondo del saco. Ante esta situación, los residentes decidieron realizar una laparotomía exploratoria debido a la posibilidad de un embarazo ectópico o un quiste ovárico roto. NO SE CONSULTÓ A NINGÚN MÉDICO INTERNISTA.

---

[1] La señora Martínez comenzó su período menstrual el 2 de agosto de 1982 y se extendió durante cuatro (4) días. El 7 y 8 de agosto la paciente tuvo flujo vaginal color marrón.

[2] Esta prueba consiste en la inserción de una aguja en la parte posterior de la vagina, aproximadamente detrás del punto en que la pared vaginal une con la cervix (fondo del saco de Douglas). Si se extrae sangre de ese lugar se confirma una hemorragia intraperitoneal. *Cf.* Willson & Carrington, *Obstetrics and Gynecology*, San Luis, C.V. Mosby Co., 1987, pág. 234.

La paciente fue llevada a la sala de operaciones a las 5:50 P.M. En ese momento, no se hicieron los exámenes de laboratorio. Sus extremidades superiores y las uñas presentaban un color grisáceo y su piel estaba fría. La presión sanguínea era 0/0 (*shock* hipovolémico). A las 6:00 P.M. se le administró anestesia y se iniciaron los preparativos. La cirugía fue practicada por dos (2) residentes. A las 6:20 P.M. sufrió un paro cardíaco, pero fue resucitada con epinefrina y bicarbonato. Poco más de media hora después de iniciada la cirugía, se le comenzó a practicar una transfusión de quinientos (500) cc. de sangre. El protocolo de la operación revela que se encontraron doscientos (200) cc. de sangre negra en la cavidad abdominal, sin que en el examen de los órganos pélvicos se pudiera hallar ninguna fuente de sangría activa.

Terminada la operación, a las 7:18 P.M., el médico ordenó su traslado a la unidad de cuidado intensivo. ALLÍ *REHUSARON RECIBIRLA*, PUES ALEGADAMENTE EL DEPARTA- MENTO DE GINECOLOGÍA Y OBSTETRICIA NO TENÍA *DERECHO* A UNA CAMA EN ESE LUGAR.

Aproximadamente *hora y media después* de concluida la cirugía, en la sala de recuperación ordenaron tratamiento para choque hipovolémico. Más tarde la paciente fue llevada nueva- mente a la sala de operaciones para una radiografía de pecho. Debido a la dificultad para respirar y a que continuaba cianótica, fue entubada y llevada entonces a la unidad de cuidado intensivo. Allí se le colocó en un respirador y se inició el proceso de resucitación cardiopulmonar que resultó infructuoso. Poco des- pués, la señora Martínez fue declarada muerta.

El patólogo forense del Centro Médico de Mayagüez, Dr. Jesús Vega López, concluyó que la muerte era atribuible a un edema pulmonar, probablemente asociado con un fallo congestivo del corazón.

## II

Frente a estos hechos, la ilustrada sala de instancia declaró sin lugar la demanda, aun cuando concluyó que la cirugía practicada había contribuido a la muerte de la paciente. Incidió.

La prueba pericial de la parte demandante fue abrumadora. El Dr. Manuel Piza Escalante, especialista en cirugía, declaró que tanto los médicos del Hospital Municipal como los del Centro Médico de Mayagüez fueron negligentes en el diagnóstico y tratamiento brindado. En conformidad con el resumen del tribunal de instancia, según dicho perito

> . . . *la paciente presentaba un cuadro de trauma ("shock") no hipovolémico de etiología difícil de determinar por lo inadecuado del estudio que se le realizó y la falta de datos en el récord clínico.* Falleció como consecuencia *de un edema pulmonar no cardiogénico, agravado por la infusión de gran cantidad de líquido cristalino con sodio y el efecto depresor de la anestesia general.* Se puede resumir su opinión de la siguiente manera:

> En cuanto al *Hospital Municipal*

> (a) Incurrió en error de interpretación del resultado de laboratorio (reducción del hematocrito y la hemoglobina) ya que lo que se produjo fue la normalización del estado previo de hemoconcentración.

> (b) No hubo vigilancia médica adecuada, ya que le suministraron a la paciente 4,000 cc de líquidos con sodio sin examinar periódicamente la presión venosa central y el volumen de orina; y no se controló el hematocrito.

> (c) No había bases para el diagnóstico de embarazo ectópico por varias razones: no había amenorrea, ni trastornos menstruales; no había causas que predispusieran a ello (enfermedad pélvica inflamatoria o malformaciones congénitas), como se desprende de un historial obstétrico normal; no había masa pélvica palpable; la prueba de embarazo había resultado negativa; y *no había evidencia de anemia (el único hematocrito estaba en 41).*

> Además, apuntó que la mayoría de los embarazos ectópicos que sangran lo hacen lentamente y estas pacientes se presentan al hospital en estado de trauma ("shock") y *anemia marcada, lo cual no ocurrió en este caso.*

> Por otro lado, opinó que los médicos del Hospital Municipal actuaron negligentemente cuando, al sospechar una sangría intra-

abdominal, no se le hizo una transfusión de sangre o coloides y se retuvo a la paciente en un centro no capacitado para operarla desde las 10:00 AM hasta las 4:30 PM *sin realizar estudios que permitieran descartar otras causas etiológicas del choque ("shock") y sin examinar periódicamente la diuresis y la presión venosa central.*

*Respecto al Centro Médico señaló:*

(a) La falta de exámenes de laboratorio (hematocrito y hemoglobina) para corroborar la anemia.

(b) La falta de un estudio de la sangre obtenida por culdocentesis.

(c) La falta de otros estudios diagnósticos como un *sonograma.*

(d) La precipitación al llevar a sala de operaciones a una paciente en severo estado de "shock" sin intentar mejorar su condición con transfusiones de sangre ni determinar su presión venosa central y diuresis, y sin consultar en la etapa preoperatoria a un médico internista u *otro especialista que pudiera contribuir a llegar a un diagnóstico correcto.*

(e) Hubo negligencia administrativa del hospital al no brindarle en el tratamiento postoperatorio inmediato el beneficio de atención especializada en la unidad de cuidado intensivo.

El *otro perito* de la parte demandante, Dr. Salomon Fishwasser, es médico con especialidad en cardiología. En su opinión, hubo negligencia imputable a los médicos del Centro Médico de Mayagüez. Se puede resumir su opinión de la siguiente manera:

(a) El aspecto clínico más importante fue someter a esta paciente a una cirugía abdominal bajo anestesia general, cuando se encontraba en aparente estado de "shock", lo cual se asocia con una mortalidad operatoria y postoperatoria *inmediata alta.*

(b) *La paciente se debió evaluar mejor desde el punto de vista médico para intentar ofrecerle tratamiento médico dirigido a mejorar su condición hemodinámica e hidroelectrolítica antes de intentar el acto quirúrgico.*

(c) *No existían suficientes exámenes de laboratorio y de gabinete en el expediente (por ejemplo, gases arteriales, más leucogramas y radiografías, etc.) para definir la etiología del aparente "shock". Su impresión es que se trataba de un "shock" séptico.*

(d) La paciente se operó en estado aparente de "shock", en franca hipotensión, hipoxémica y, muy posiblemente, en estado severo de acidosis, sin adecuada evaluación bioquímica ni examen periódico dinámico. A ello se le añadió el efecto depresor de la anestesia. Estas dos condiciones eran elementos suficientes para

provocarle el primer paro cardíaco, el cual pudo ser producido por una taquirritmia ventricular.

(e) No se menciona ni se dispone de ningún electrocardiograma en el expediente médico.

(f) En un estudio radiológico reportado, se menciona un infiltrado reticulonodular difuso (pulmón blanco) y no se menciona cardiomegalía alguna.

(g) En la autopsia el corazón se describe como de peso normal, sin evidencia de dilatación, y se informa que en las secciones histológicas del corazón no se encontraron anormalidades.

A base de todos estos hechos, su opinión es que la paciente *falleció debido a un edema pulmonar no cardiogénico o "síndrome de 'distress' respiratorio del adulto," con falla multisistemática en relación a la realización de una cirugía en una paciente con corazón previamente sano, en estado grave de* shock *(posiblemente séptico) y/o relacionada con su condición metabólica (hipoxemia, acidosis), todo ello unido al efecto depresor de la anestesia.*

Basándose en el historial clínico de la paciente, que evidencia una virtual ausencia de síntomas cardiovasculares, y en los hallazgos de la autopsia, el perito está en desacuerdo con la posición del perito de la parte demandada en cuanto a que la causa de la muerte pueda ser una miocarditis difusa letal que haya producido claudicación y fallo ventricular. (Énfasis suplido.) *Exhibit* II, págs. 7–11.

En relación con la prueba del demandado, el tribunal de instancia condensó los testimonios de los peritos Dr. Walter Pinedo (especialista en obstetricia y ginecología), Dr. Germán Malaret (especialista en medicina interna) y Dr. Ángel A. Román Franco (patólogo con especialidad en inmunopatología) del modo siguiente:

El Dr. Pinedo opinó que no hubo negligencia en este caso; que la paciente se presentó al hospital sudorosa y pálida; que aunque se registraba presión sistólica no se percibía la diastólica; que la paciente estaba taquicárdica; que el hematocrito bajó de un día para otro; y que la culdocentesis demostró que *había sangre* en el fondo del saco. Opinó que ante ese cuadro era razonable suponer que la paciente tenía una hemorragia interna por lo que era inescapable concluir que procedía una operación exploratoria.

Admitió que con la evidencia médica que se tiene al día de hoy tras la autopsia de la causante no la habría operado, pero con la

información que los médicos que la intervinieron tenían en aquel momento, él hubiera actuado de la misma manera que ellos.

Respecto a la prueba de embarazo que se le practicó a la paciente en el Hospital Municipal, refutó la idea de que era mandatorio descartar el diagnóstico de embarazo ectópico, pues estas pruebas no son concluyentes (al menos la prueba de precipitación que era la que existía en 1982).

Adujo que la ausencia de sonograma obedeció al hecho de que en esa época el Centro Médico de Mayagüez no tenía disponible el equipo para realizarlo. (*Aunque lo negó, existía en un hospital privado dentro del pueblo de Mayagüez.*)

En cuanto a que del historial de la paciente aparecía que esta había tenido una menstruación normal una semana antes, *el Dr. Pinedo opinó que la causante muy bien pudo tomar el sangrado vaginal como su menstruación cuando realmente se trataba de manchado de sangre al producirse la implantación del cigoto.*

El Dr. Pinedo (al igual que los peritos de la parte demandante) opinó que el diagnóstico de embarazo ectópico roto es *una emergencia médica que requiere operación de inmediato.* Si con un diagnóstico de embarazo ectópico roto no se opera, ello constituiría *negligencia.*

De otro lado, el perito *reconoció* que la paciente *no fue evaluada por ningún especialista en algún campo de la medicina y que debió haber sido vista por uno. Fue atendida únicamente por residentes* del hospital. También admitió que en el Centro Médico de Mayagüez existen problemas con la sala de cuidado intensivo y que, como regla general, en Puerto Rico "el pobre recibe servicios médicos de segunda y tercera clase".

El Dr. Germán Malaret opinó que Josefina murió de miocarditis viral fulminante aguda para lo cual no había medicinas ni tratamiento. La única ruta disponible es un transplante del corazón, pero el diagnóstico solamente podía hacerse por biopsia (no disponible en Puerto Rico) o por autopsia (cuando ya el paciente se ha muerto sin remedio).

El Dr. Malaret admitió que la paciente fue sometida a la operación en franco estado de "shock", en estado grave por lo que podía morirse en la operación, como en efecto sucedió. Apuntó que fue resucitada y, aunque no se envió a la unidad de cuidado intensivo y sí a la sala de recuperación, en ésta se le brindó el cuidado intensivo que ella requería. En el contrainterrogatorio aceptó que la muerte por *miocarditis viral es la excepción.*

El Dr. Román Franco, por su lado, examinó un corte de cada uno de los siguientes órganos: corazón, uno del pulmón, ovario y miometro. Aunque hubo controversia en cuanto a la admisibilidad de dicha prueba por no haberse establecido adecuadamente la cadena de evidencia, permitimos su declaración. *No obstante, tenemos que descartar su opinión porque los hallazgos de sus análisis son incompatibles con los del Dr. Vega López en la autopsia según veremos posteriormente.* El propio Dr. Vega López, quien declaró como testigo de refutación por la parte demandante, declaró que si las laminillas de la causante hubieran mostrado lo que alega el Dr. Román Franco, él lo hubiera visto.

*De acuerdo con el protocolo de autopsia del estudio macroscópico y microscópico del corazón se desprende que la paciente tenía un corazón sano y normal.* (Énfasis suplido.) *Exhibit* II, págs. 11–13.

### III

Esta prueba pericial, llevó al tribunal de instancia a descartar correctamente el diagnóstico de miocarditis del doctor Malaret. En consecuencia, circunscribió la controversia a si la equivocación en el diagnóstico generaba responsabilidad. Concluyó en la negativa.

A esos efectos, determinó que el primer día los médicos municipales diagnosticaron correctamente la condición y que la gravedad que presentó al día siguiente fue una variante. Aunque la retuvieron en el Hospital Municipal San Antonio de Mayagüez durante cinco (5) horas, "la tardanza no fue la causa próxima de su muerte. La paciente murió porque debido a un diagnóstico equivocado de embarazo ectópico o quiste ovárico roto que resultó ser equivocado, fue sometida a una operación, mientras se encontraba en estado de "shock", de la cual tenía muy pocas probabilidades de sobrevivir". *Exhibit* II, pág. 20.

El Estado también fue relevado de responsabilidad. Se fundó en que en el contexto de los eventos desarrollados seguidamente, los galenos que intervinieron en la operación afrontaron "una situación de vida o muerte". A su entender, "Josefina se moría sin remedio y la ciencia de sus médicos no era milagrosa". *Exhibit* II, pág. 25.

# IV

Distinto a la "situación de vida o muerte" aludida por la sala sentenciadora, no albergamos duda de que el fallecimiento fue agravado y producto directo de la negligencia de los médicos de ambos hospitales. Veamos.

Del récord médico del Hospital Municipal San Antonio de Mayagüez surge que la paciente fue tratada por médicos generalistas el 9 y 10 de agosto. Al momento de su traslado sólo se contaba con un *diagnóstico* preliminar. En ningún momento fue evaluada por un médico internista. Más aún, ni antes ni después de la operación efectuada en el Centro Médico de Mayagüez, su caso fue considerado por un especialista.

Los residentes del Centro Médico de Mayagüez contravinieron el Reglamento de Internos y Residentes del Departamento de Salud que les exige discutir toda complicación con sus superiores inmediatos o médicos facultativos de otros jefes de departamento y les prohíbe ordenar la preparación de la sala de operaciones sin conocimiento del jefe de servicios o su delegado. Mucho menos pueden operar sin la supervisión de un cirujano.

Los indicadores objetivos reflejan que el descenso en veinticuatro (24) horas de dieciséis (16) a trece (13) gramos en la hemoglobina de la señora Martínez Vélez se debió a la hemoconcentración por deshidratación. Ello mejoró con el tratamiento de líquidos brindado. La prueba de laboratorio realizada en el Centro Médico de Mayagüez, a las 5:00 P.M. evidenció *una hemoglobina normal (12.9) y un hematocrito normal (39)*.

No cabe duda, pues, de que el cuadro de síntomas presentado por la señora Martínez Vélez en ambos hospitales indicaba más de una posibilidad diagnóstica. Su corazón era normal.

La "sangre" obtenida de la *culdocentesis* no se envió al laboratorio para estudio. Su último período menstrual fue el 2 de agosto, duró cuatro (4) días y fue normal. Ese dato era irreconciliable con la *posibilidad de un ectópico roto el 10 de agosto*. Ese mismo día tenía cianosis, circunstancia incompatible con la *anemia* provocada por un sangrado. Antes de la operación tenía sus

*pulmones claros*, ventilaba bien, y luego de la operación *desarrolló edema pulmonar.*

## V

Es un hecho indiscutible que la cirugía practicada en este caso contribuyó directamente a la muerte de la señora Martínez Vélez.

En casos de impericia médica, la norma mínima de cuidado exigible es aquella que a la luz de los modernos medios de comunicación y enseñanza, y conforme al estado de conocimiento de la ciencia y la práctica prevaleciente de la medicina, satisface las exigencias generalmente reconocidas por la profesión. *Rodríguez Crespo v. Hernández,* 121 D.P.R. 639 (1988), opinión disidente; *Ríos Ruiz v. Mark,* 119 D.P.R. 816 (1987), opinión disidente; *Morales v. Hospital Matilde Brenes,* 102 D.P.R. 188 (1974); *Oliveros v. Abréu,* 101 D.P.R. 209, 226–227 (1973). Para que un error de juicio médico exima de responsabilidad, tiene que ser honesto e informado en el diagnóstico o tratamiento, de un cuadro en que las autoridades médicas están en desacuerdo sobre cuál es el diagnóstico o tratamiento más adecuado, o cuando el patrón que siguió el médico es una práctica aceptada por la profesión médica en esa clase de situaciones. *Pérez Torres v. Bladuell Ramos,* 120 D.P.R. 295 (1988); *Cruz v. Centro Médico de P.R.,* 113 D.P.R. 719 (1983). Claro está, el médico ha de llevar a cabo los exámenes necesarios así como un esfuerzo concienzudo y honesto para enterarse de la condición del paciente. *Morales v. Hospital Matilde Brenes,* supra.

En relación con el hospital, es norma aceptada que éste debe brindar al paciente aquel grado de cuidado que ejercería un hombre prudente y razonable en condiciones y circunstancias similares. *Márquez Vega v. Martínez Rosado,* 116 D.P.R. 397, 405 (1985); *Núñez v. Cintrón,* 115 D.P.R. 598, 613 (1984); *Crespo v. H.R. Psychiatric Hosp.,* 114 D.P.R. 796, 800 (1983).

La señora Martínez Vélez llegó al hospital con una constelación de síntomas y signos que en principio sugerían un cuadro viral. Al día siguiente se presentó nuevamente a sala de emergen-

cia con síntomas y signos adicionales, los cuales exigían un diagnóstico diferencial más abarcador que el original. La baja presión arterial, así como la disminución en los gramos de hemoglobina y porcentaje de hematocrito, unido al dolor abdominal que presentaba la paciente, indujo a los médicos a llevar a cabo una serie de pruebas diagnósticas adicionales. Así, pues, se llevó a cabo un examen pélvico con espéculo, el cual reveló una descarga vaginal color marrón.

El cuadro clínico presentado, según se ha descrito, hizo considerar a los galenos la posibilidad de un embarazo ectópico. Un embarazo ectópico es aquel que se produce al haber implantación del cigoto fuera del útero. J.G. Zimmerly, ed., *Lawyers Medical Cyclopedia*, Virginia, The Michie Co., Sec. 36:20, pág. 539; *The Merck Manual*, Merck & Co., Inc., 1982, pág. 1725. Su diagnóstico no siempre es fácil.

> The diagnosis of tubal pregnancy is not easy before it ruptures and produces potentially lethal consequences. Pain is common but may be difficult to differentiate from other pain-producing abdominal catastrophes. The presence of blood in the abdominal cavity, regardless of source, produces direct and referred pain. Because the patient is or has been legitimately pregnant, it is reasonable to expect a history of missed menstrual periods. However, this finding is not consistently present. Similarly, PREGNANCY TESTS (see sec. 2.64) are not reliable indicators (may show no pregnancy in up to one half of cases).
>
> Signs of internal bleeding leading to shock appear sequentially dependent on the amount of blood loss.
>
> One of the most frequent signs is remarkable tenderness in the abdomen and pelvis which is caused during a pelvic examination by moving the cervix. This pain must be distinguished from acute salpingitis, an infection of the fallopian tube. When the infection is the causative agent, an elevated temperature usually accompanies the tenderness.
>
> The following conditions must be differentiated from a tubal pregnancy: salpingitis; abortion, threatened or incomplete, of an intrauterine pregnancy; torsion of an ovarian cyst; rupture of an ovarian cyst; appendicitis; and gastroenteritis. Ausman & Snyders, *Medical Library, Lawyers Edition*, Vol. 1, Sec. 2:8, págs. 269–270.

Reconocemos que los signos presentados por la paciente en el caso de autos reflejaban la posibilidad de tal diagnóstico y que esa condición es de consecuencia mortal. Por lo tanto, era necesario descartar objetivamente la posibilidad de un embarazo ectópico. El resultado de la culdocentesis —procedimiento apropiado para la determinación de fluido en el fondo del saco de Douglas— resultó positivo. Hasta aquí los médicos fueron diligentes.

Ahora bien, fallaron al no consultar ni requerir la opinión de un internista o ginecólogo. Ello era imprescindible. Dentro de la gama de posibilidades diagnósticas que presentaba el cuadro de la señora Martínez Vélez, el embarazo ectópico era solamente una alternativa. Ciertamente, la consulta con un *attending* hubiese brindado mejores elementos de juicio y mayores oportunidades de vivir. Curiosamente, aquí esa misión le hubiese correspondido al Dr. Walter Pinedo, quien en calidad de perito del Estado aceptó las diferencias existentes entre los servicios prestados en la práctica pública y la privada.

En resumen, estamos ante un caso en el cual sin que surgiera del récord justificación alguna, los internos decidieron llevar a cabo una cirugía sin autorización de sus superiores ni la supervisión de especialistas.