VÍCTOR L. PAGÁN RIVERA, ETC., demandantes y recurrentes, *v.* MUNICIPIO DE VEGA ALTA, ETC., demandados y recurridos.

*Número:* R-84-519          *Resuelto:* 20 de noviembre de 1990

*Sigfredo A. Irizarry Semidei* y *José E. Sánchez Soliván,* abogados de los recurrentes; *Rafael Ortiz Carrión, Procurador General, Raúl Barrera Morales* y *Américo Serra, Procuradores Generales Interinos, Miguel A. Santana Bagur* y *Vanessa Ramírez, Procuradores Generales Auxiliares,* abogados de los recurridos.

## SENTENCIA

El recurso de epígrafe tiene su origen en una acción de daños y perjuicios por alegada impericia médica en el tratamiento

médico que se le administrara al niño José Pagán Class durante los días 7 y 8 de julio de 1976 mientras estuvo recluido en el Centro de Salud de Vega Alta. La Sra. Iris D. Class, madre del niño Pagán, con motivo de una fiebre alta que aquejaba a éste lo llevó al referido Centro de Salud alrededor de la 1:00 P.M. del día 7 de julio de 1976. A eso de las 3:00 P.M. de ese día el niño fue examinado por el Dr. Ramón Urbáez, haciendo el mismo la siguiente anotación en el récord médico:

> Al examen oído normal, ligero enrojecimiento de garganta. A la auscultación pulmones algunos estertores roncos en ambos campos pulmonares. Se ordena tratamiento de emergencia y se observará. Apéndice 41: *Progress Notes.*

Ante dicho cuadro, el doctor Urbáez prescribió el siguiente tratamiento médico: (a) dieta líquida; (b) baños PRNA (según sea necesario); (c) supositorios de aspirina 60mg, vía rectal cada cuatro (4) horas según sea necesario; (d) albatemp líquido (tempra), una cucharadita cada seis (6) horas, y (e) chequear temperatura constantemente.

Con posterioridad al comienzo del referido tratamiento médico, el doctor Urbáez a eso de las 4:30 P.M. del día 7 de julio de 1976 anotó en el récord del menor que la temperatura comenzó a bajar y ordenó que se continuara con el tratamiento prescrito y la observación, señalando además una recomendación al médico de guardia a los efectos de "ordenar referir en caso necesario". E.N.P., págs. 18 y 19. En el transcurso de la noche del referido día 7 de julio de 1976, hasta la mañana del día 8 de julio de 1976, hubo varias anotaciones en el récord médico del menor. Así, a las 8:00 P.M. del día 7, la enfermera de turno anotó la temperatura del niño en 38°C, señalando que a esa hora el niño estaba "tranquilo y tomando bien los medicamentos". En la mañana del día 8 de julio de 1976, a eso de las 8:30 A.M., el niño fue evaluado por el médico de turno; éste indicó que el niño "pasó la noche relativamente tranquilo con temperatura intermitente". Íd. En esa mañana, adicionalmente hay una anotación de la enfermera de turno en donde se indicó que la temperatura del niño era de 39.5°C, siendo tratado el mismo con baños de alcohol, recibiendo sus medicamen-

tos por la vía oral. A las 2:30 P.M. del día 8 de julio de 1976 se registra otra evaluación del niño por el médico de turno en el Centro de Salud. Como resultado de la misma se anota "paciente tranquilo, temperatura bajó a 38.2°C". Íd., pág. 18. El niño también fue evaluado a las 4:30 P.M. del día 8 de julio de 1976. En relación con dicha evaluación, el récord médico refleja que la temperatura del niño permaneció en 38.2°C, anotando el médico "continuar tratamiento, avisar médicos de guardia, evaluar y referir en caso necesario". Hay una anotación posterior de la enfermera de turno en la cual se indica que la madre del niño informa "que el niño tiene dificultad de respirar y luce intranquilo". En dicho momento, la temperatura rectal del niño era de 40°C, procediendo a examinarlo el doctor Vergés, quien al observar una crisis respiratoria en el menor lo refirió al Servicio de Pediatría del Centro Médico de San Juan. En el correspondiente "referido", el galeno indicó que el niño, de un (1) año de edad, estuvo hospitalizado, tiene fiebre de 40°C, presentó convulsiones, taquicardia, estertores, no mejorando con el tratamiento, señalando como diagnóstico tentativo "Bronquitis Aguda". El niño José Pagán llegó en ambulancia al Centro Médico de San Juan aproximadamente a eso de las 8:00 P.M. del día 8 de julio de 1976. El día 9 de julio de 1976, a las 5:00 de la tarde, el niño falleció mientras estaba hospitalizado en el Centro Médico de San Juan.

## I

El día 2 de mayo de 1977, la parte demandante presentó demanda de daños y perjuicios ante el Tribunal Superior de Puerto Rico, Sala de Bayamón, en la que alegó, en síntesis y en lo pertinente, que los demandados incurrieron en conducta negligente (mala práctica de la medicina) al no haber referido al niño para que fuera atendido en algún otro hospital luego de haber sido examinado en el Centro de Salud de Vega Alta. También alegaron que el niño, al momento en que fue examinado en el referido Centro de Salud, padecía de pulmonía severa por lo que era necesario que se le tomara una radiografía de pecho, que se le

administrara suero y que se colocara al menor en una tienda de oxígeno. Por último, alegaron que la causa del fallecimiento del niño el día 9 de julio de 1976 se debió a que no se le administraron los servicios médicos necesarios durante el transcurso de tiempo en que el niño estuvo hospitalizado en el Centro de Salud de Vega Alta.

La parte demandada negó la negligencia imputádale, sosteniendo que mientras el niño estuvo en el Centro de Salud de Vega Alta recibió un tratamiento adecuado, correspondiente el mismo al cuadro clínico observado en el menor. El tribunal de instancia, luego de celebrada la correspondiente vista evidenciaria, mediante sentencia emitida el día 10 de octubre de 1984 desestimó la demanda incoada por los aquí recurrentes. Dicho foro, en síntesis y en lo pertinente y basándose en la prueba ofrecida, concluyó como cuestión de derecho que "el tratamiento ofrecídole al niño José Pagán en el Centro de Salud de Vega Alta fue del nivel o calidad que llena las exigencias generalmente reconocidas por la profesión médica". Apéndice, pág. 36.[1]

De dicha sentencia, acudió ante este Tribunal la parte demandante, vía recurso de revisión. En su recurso señala los siguientes planteamientos de error:

1. Si ante observaciones que indican una gran probabilidad de la existencia de pulmonía doble en un niño de un año de edad y ante la ausencia de facilidades para el diagnóstico y tratamiento adecuado de esa condición en su dispensario, el médico que examina al niño viene obligado a referirlo a alguna institución de salud donde existan tales facilidades.

2. Si ante la totalidad de la prueba desfilada en este caso y ante las numerosas y serias inconsistencias en las teorías, contenciones y prueba de la parte demandada, actuó correctamente el Honorable Tribunal de [I]nstancia al concluir que la presunción sobre tratamiento médico adecuado no fue controvertida y al adoptar verbatim las más recientes teorías, contenciones y argumentos de dicha parte, desechando todas las contenciones y prueba de la parte

---

[1] Véase Sentencia emitida en el caso de epígrafe, de 10 de octubre de 1984, por el Tribunal Superior de Puerto Rico, Sala de Bayamón (Hon. José F. Rodríguez Rivera, Juez).

demandante, inclusive las declaraciones de los padres de la víctima, quienes fueron las únicas personas que, de entre los testigos presenciales, se presentaron durante el juicio.

3. Si actuó o no erróneamente el Honorable Tribunal de Instancia al no concluir que ni el personal médico ni el personal paramédico del Centro de Salud de Vega Alta incurrieron en negligencia en relación con la atención y tratamiento provistos allí al niño José Pagán Class durante los días 7 y 8 de julio de 1976.

4. Si cometió o no error el Honorable Tribunal de Instancia al concluir que independientemente de las actuaciones y omisiones del personal médico y paramédico del Centro de Salud de Vega Alta en relación con el niño José Pagán Class, éste habría de fallecer inevitablemente en 9 de julio de 1976. Solicitud de revisión, págs. 11–12.

Expedimos el auto solicitado; posteriormente ordenamos que se preparara una exposición narrativa de la prueba. Habiendo comparecido ambas partes y estando en posición de decidir, procedemos a así hacerlo.

## II

En *Pérez Torres v. Bladuell Ramos*, 120 D.P.R. 295, 297–298 (1988), expresamos:

Las acciones por alegada impericia médica constituyen o representan un reto especial para los jueces. Dichos casos siempre versan sobre la ocurrencia de un daño; uno que, por lo general, resulta impresionante y doloroso. No obstante el natural sentimiento de compasión que todo ser humano experimenta al enfrentarse al daño y sufrimiento de otro ser humano, los jueces tenemos que mantener siempre presente que el mero hecho de que haya ocurrido un daño no significa que el médico es civilmente responsable por el mismo. En otras palabras, no podemos darnos el lujo de que nuestros sentimientos dominen nuestro discernimiento. De así permitirlo, estaríamos incumpliendo con nuestra función como jueces.

Manteniendo presente lo antes expuesto, pasamos a examinar la controversia planteada en el caso de epígrafe. Como es sabido, en *Oliveros v. Abréu*, 101 D.P.R. 209, 226 (1973), originalmente establecimos la norma a ser utilizada en nuestra jurisdicción para

determinar la responsabilidad de los médicos en casos de alegada mala práctica profesional. La referida norma le impone a éstos la obligación de ofrecer a sus pacientes aquella atención médica que a la luz de los modernos medios de comunicación y enseñanza, satisfaga las exigencias generalmente reconocidas por la propia profesión médica. *Pérez Torres v. Bladuell Ramos*, ante; *Rodríguez Crespo v. Hernández*, 121 D.P.R. 639 (1988); *Ríos Ruiz v. Mark*, 119 D.P.R. 816 (1987), y *Cruz v. Centro Médico de P.R.*, 113 D.P.R. 719 (1983), entre otros.

No obstante, al médico se le reconoce una amplia discreción en el cuidado de un paciente. En ese sentido, hemos dicho que un médico no "incurre en responsabilidad si el tratamiento que le brinda a su paciente, aun cuando erróneo, está enmarcado en los linderos de lo razonable y es aceptado por amplios sectores de la profesión médica; constituyendo defensa válida para el médico demandado la existencia de divergencia de criterios entre las autoridades médicas sobre si el tratamiento o procedimiento en particular era correcto bajo las circunstancias del caso". *Pérez Torres v. Bladuell Ramos*, ante, págs. 303–304, citando con aprobación a *Lozada v. E.L.A.*, 116 D.P.R. 202, 217 (1985), entre otros.

Por otro lado, la parte demandante viene en la obligación de probar mediante preponderancia de prueba que el tratamiento ofrecido por el demandado fue el factor que con mayor probabilidad ocasionó el daño sufrido por el paciente. *Rodríguez Crespo v. Hernández*, ante; *Cruz v. Centro Médico de P.R.*, 113 D.P.R. 719, 744 (1983); *Zambrana v. Hospital Santo Asilo de Damas*, 109 D.P.R. 517, 521 (1980). Ello es así, toda vez que en estos casos existe una presunción de que el médico le brindó un tratamiento adecuado a su paciente, lo que le impone al demandante la obligación de rebatir dicha presunción a través de la presentación de prueba suficiente en contrario. *Rodríguez Crespo v. Hernández*, ante. En otras palabras, la parte demandante tiene que probar que el tratamiento suministrado por el demandado no fue el adecuado. Véase *Rosado Rosado v. E.L.A.*, 108 D.P.R. 789, 792 (1979).

Asimismo, hemos señalado que para que se establezca *prima facie* un caso de daños y perjuicios por alegada mala práctica en la medicina es necesario que el demandante presente prueba satisfactoria sobre: (1) las normas mínimas de conocimiento y cuidado médico aplicables a los generalistas o a los especialistas, y (2) la *relación causal* entre la actuación u omisión del facultativo y la lesión sufrida por el paciente. *Medina Santiago v. Vélez*, 120 D.P.R. 380 (1988). Es conveniente recordar que al momento de ejercer nuestra función revisora, en casos como el de epígrafe, nuestra decisión puede fundarse en aquella prueba *pericial y documental* que haya sido presentada ante el foro de instancia. *Ríos Ruiz v. Mark*, ante, págs. 821–822. En relación con lo antes expresado, resulta procedente enfatizar que en aquellos casos en que prevalezca un conflicto en relación con la prueba pericial desfilada, hemos establecido que este Tribunal, al igual que el foro de instancia, podrá optar por aquella posición que le "merezca más crédito". *Zambrana v. Hospital Santo Asilo de Damas*, ante; *Prieto v. Maryland Casualty Co.*, 98 D.P.R. 594 (1970), y *Pereira v. E.L.A.*, 91 D.P.R. 750 (1965).

### III

Al aplicar la normativa jurisprudencial antes expuesta a los hechos del pleito de epígrafe debemos determinar si, a la luz del cuadro clínico que presentaba el menor fallecido al llegar al Centro de Salud de Vega Alta, constituyó o no negligencia el tratamiento médico que se le brindó en dicho Centro. Concluimos, al igual que el foro de instancia, que el mismo fue uno adecuado y razonable de acuerdo con las prácticas generalmente reconocidas por la profesión médica. Veamos.

En el tribunal de instancia, la parte demandante recurrente, a través de su único perito médico Dr. Leonardo Collazo López[2] trató de establecer, por un lado, que los médicos que inicialmente

---

[2] El doctor Collazo López, estudió medicina en la Universidad de Puerto Rico y tiene una especialidad en cirugía. Además, su testimonio descansó en una revisión de los récord médicos del menor y del informe de autopsia.

atendieron al niño Pagán no llegaron a un diagnóstico luego de que se examinara al menor por primera vez, y, de otra parte, que el tratamiento que se le administró no fue uno adecuado. Señaló el referido galeno que un niño, en circunstancias similares a las del menor Pagán, necesita un tratamiento más "agresivo en antibióticos", esto debido a la infección que padecía el mismo. Sostuvo, además, el doctor Collazo López que el antibiótico "Erytrocyn", *que le fue administrado al niño*, debe ser utilizado en "condiciones leves y no en infecciones serias como la pulmonía bilateral". E.N.P., pág. 9. El referido galeno también opinó que, debido a la inexistencia de facilidades para realizar radiografías y para efectuar análisis, el niño debió haber sido referido a un hospital que las tuviese tan pronto como el niño llegó al Centro de Salud de Vega Alta.

El doctor Collazo López, luego de examinar el Certificado de Defunción y el Protocolo de Autopsia, llegó a la conclusión de que el menor murió debido a un problema cardio-pulmonar como consecuencia de una pulmonía. En torno al hallazgo de "polio bulbar", reflejado a través de un examen de algunas muestras del tejido cerebral del niño Pagán, el doctor Collazo López señaló que ya que la pulmonía es una de las complicaciones del polio, entiende que si se hubiera tratado adecuadamente la misma, el niño hubiese tenido más de 50% de probabilidades de sobrevivir a la misma. Finalmente, opinó que a tono con las circunstancias presentes en el caso del niño Pagán, entiende que éste no tenía polio e insistió en que el niño murió de pulmonía y no de polio.[3]

La prueba presentada por la parte demandada recurrida consistió, principalmente, de los testimonios prestados por el Dr. Raúl López Correa[4] y las patólogos forenses Dra. Yocasta Brugal y Dra. Rosa Fiol Rodríguez.

En cuanto a las circunstancias que precedieron a la muerte del niño Pagán, el doctor López Correa testificó en síntesis que:

---

[3] Véase E.N.P., págs. 8–15.
[4] El Dr. Raúl López Correa obtuvo especialidad en pediatría en el 1968; es Catedrático Asociado en la Escuela de Medicina y trabaja en el Hospital Universitario del Niño como pediatra. Pertenece a la Academia de Pediatría Americana, no ha servido como perito antes, ni participó en el tratamiento médico ofrecido al niño Pagán.

. . . [E]l niño Pagán fue debidamente atendido en el Centro de Salud de Vega Alta ante el cuadro clínico observado en ese momento. Que el niño no murió de pulmonía conforme a los hallazgos de autopsia practicada. Que el niño falleció como consecuencia de una enfermedad viral de cordón espinal del tallo cerebral y cerebelo, compatible con poliomielitis bulbar. Que dicho virus atacó el sistema nervioso central ocasionando un edema pulmonar súbita, *que no era previsible ni sospechable, que fue lo que produjo su muerte en tan poco tiempo sin que los médicos del Centro de Salud de Vega Alta pudiesen sospechar o anticipar que se trataba de un caso compatible con la poliomielitis bulbar.* No previsto inclusive por los médicos del Hospital Universitario del Niño, cuya atención médica conforme a los propios demandantes, también fue una adecuada y de excelencia. (Énfasis suplido.) E.N.P., pág. 17.

Testificó, adicionalmente, el doctor López Correa que, antes de que el niño tuviera un deterioro físico marcado y que se ordenara su traslado al Centro Médico, la condición del mismo no sugería que la enfermedad fuese de gravedad. Ante dicho cuadro clínico declaró que, aun cuando en el expediente médico no consta que se hiciera diagnóstico como tal, los hallazgos de enrojecimiento de la garganta y estertores a la auscultación pulmonar sugerían una infección respiratoria, por lo que el tratamiento brindado fue uno adecuado.

En relación con el tratamiento brindado, en específico en cuanto al antibiótico ordenado y suministrado al menor —eritromicina— por los facultativos médicos adscritos al Centro de Salud de Vega Alta, testificó el perito López Correa que el mismo "es una droga efectiva contra . . . los patógenos que podrían causar una neumonía no-viral en un niño de esta edad". E.N.P., pág. 20. Declaró el doctor López Correa que su posición respecto a ello es sostenida por reconocidas autoridades en el campo de las enfermedades infecciosas en niños. A esos efectos, citó el referido galeno un artículo publicado en el *Journal of Pediatrics*, suscrito el mismo por los doctores Eichenwald y MacCroken, en el mes de septiembre de 1978 —dos (2) años después de ocurrido el deceso del niño Pagán— en donde se señala que la eritromicina es un antibiótico excelente para la terapia de infecciones bacterianas respiratorias comunes, siendo el

mismo el menos tóxico de los antibióticos. En cuanto a este punto, por último, señaló el doctor López Correa que una reconocida autoridad en la materia, el doctor Edwing L. Kending —quien es profesor de pediatría del Virginia Medical College— en su obra de texto *Disorders of the Respiratory Tract in Children*, Philadelphia, Ed. Jaunders, 1977, endosa plenamente la eritromicina en el tratamiento de infecciones pulmonares causadas por pneumococos o estreptococos.

Declaró, por último, el doctor López Correa que es de la opinión que la atención médica brindada al niño Pagán en el Centro de Salud de Vega Alta satisfacía las exigencias generalmente reconocidas por la profesión médica en el año de 1976 debido a que, conforme la sintomatología que presentaba el paciente no se podía razonablemente predecir cuán severa sería la neumonía que sufría el niño, no siendo un requisito obligatorio la toma de placas.

Como expresáramos anteriormente, la parte demandada adicionalmente presentó, como prueba pericial, a las patólogas forenses doctoras Rosa Fiol Rodríguez y Yocasta Brugal. Conforme "resumiera" el tribunal de instancia el testimonio prestado por ambas peritos,[5] la Dra. Rosa Fiol sostuvo la teoría "de que el niño José Pagán murió a causa de una poliomelitis bulbar de carácter fulminante y severa. Recalcó . . . que independientemente del tratamiento que se le hubiera dado al menor en el Centro de Salud de Vega Alta y en el Centro Médico [éste] hubiera fallecido de todas maneras por dicha causa. Señaló la testigo que no se sospechó inicialmente que el menor padeciera de polio bulbar y que el tratamiento se circunscribió a la condición pulmonar y a la sospecha de meningitis, pero se sostuvo firmemente en que la causa de la muerte fue el polio bulbar y que aun

---

(5) Según surge de una "Resolución y Orden" emitida con fecha 23 de agosto de 1985 por el Hon. Juez José F. Rodríguez Rivera —emitida con motivo de la aprobación de la exposición narrativa de la prueba— las partes no pudieron ponerse de acuerdo respecto al testimonio de las doctoras Fiol y Brugal. El referido magistrado procedió entonces a "resumir", en dicha Resolución y Orden, el testimonio prestado por las mencionadas patólogas forenses. *Procede que se enfatice el hecho de que la autopsia del niño Pagán la efectuó la doctora Brugal bajo la supervisión de la doctora Fiol.*

cuando el virus no hubiera atacado el bulbo el menor hubiera desarrollado una condición cuadriplégica". Resolución y Orden, pág. 2.

Por su parte la doctora Brugal, conforme el "resumen" que hiciera el tribunal de instancia, declaró que "se certificó inicialmente que la causa de la muerte había sido bronconeumonía y que más tarde se diagnosticó que la causa fue el polio bulbar. Sostuvo que la práctica es emitir un diagnóstico provisional sobre la muerte y luego definitivamente confirmar o emitir el diagnóstico que correspond[a]. . . . Su testimonio fue compatible con lo dicho por la Dra. Fiol en el sentido que tan pronto vio las laminillas se convenció de que la causa de la muerte del menor fue polio bulbar". Resolución y Orden, pág. 3.

## IV

Luego de un análisis sereno e imparcial de la prueba presentada a nivel de instancia, en especial de la prueba pericial, somos del criterio que resulta inescapable y mandatoria la conclusión de que la parte demandante no cumplió con su obligación de rebatir la presunción de que el paciente en controversia recibió un tratamiento adecuado por parte de los médicos y demás empleados del Centro de Salud de Vega Alta. *Rodríguez Crespo v. Hernández*, ante; *Rosado Rosado v. E.L.A.*, ante. Esto es, la parte demandante no logró establecer que la atención médica que se le brindara al niño Pagán en el referido centro de salud fuera contraria a las exigencias generalmente reconocidas por la profesión médica.

Aparte del hecho de que la prueba pericial presentada por la parte demandada nos parece ser mucho más robusta, creíble y convincente que la presentada por la parte demandante, somos del criterio que lo más que le podríamos atribuir a los facultativos médicos que atendieron al niño Pagán en el Centro de Salud de Vega Alta sería haber incurrido en un "honesto e informado error de juicio". *Pérez Torres v. Bladuell Ramos*, ante. A base de la prueba presentada, ciertamente no podemos imputarle a dichos

galenos la negligencia en el tratamiento médico del menor que conlleva la imposición de responsabilidad civil.

Por los fundamentos antes expresados, *se dicta sentencia confirmatoria de la emitida en el presente caso por el tribunal de instancia.*

Así lo pronunció y manda el Tribunal y certifica el señor Secretario General. El Juez Asociado Señor Negrón García emitió opinión disidente. El Juez Asociado Señor Hernández Denton concurre con el resultado sin opinión escrita.

(*Fdo.*) Francisco R. Agrait Lladó
*Secretario General*

—O—

Opinión disidente del Juez Asociado Señor Negrón García.

I

La muerte prematura de José Pagán Class —infante de apenas un (1) año de edad— aparte del impacto emocional y las angustias que causó a sus progenitores Víctor L. Pagán Rosa e Iris D. Class, hubiese pasado desapercibida si no es por razón de este drama judicial. "[A]l levantarse el telón —más que normas jurídicas frías— aparece la dolorosa realidad de aquello que todo el mundo sabe, pero que intenta ignorar: las diferencias entre la medicina pública para los pobres y la privada." *Martínez Cruz v. E.L.A.*, 126 D.P.R. 170 (1990), voto disidente.

Se impone una breve reflexión. Muchas de las facilidades de salud que existen en algunos "dispensarios o centros locales municipales" —como en el de autos, Vega Alta— son sumamente limitadas. Por ende, este disenso parte de la premisa de que, más allá del mundo utópico e ideal jurídico, la realidad es que no podemos exigirles a esos dispensarios o centros locales servicios de salud de excelencia irrestrictos. Sin laboratorios, facilidades y equipos para tomar radiografías, con poco personal médico y

paramédico, y escasez de medicinas, simplemente ello no es posible. Ante esta realidad, el "deber jurídico" tiene que ser que los médicos y el personal auxiliar brinden a los pacientes, en casos simples, una adecuada primera ayuda y, simultáneamente, una orientación oportuna a éste y a sus familiares en cuanto a la prognosis inicial y proyecciones posteriores. *A contrario sensu*, frente a casos complejos, graves o marginales, aumenta y se configura un "deber jurídico *mayor*" que exige de los médicos y personal ejercer todo el cuidado posible para detectar las condiciones que requieran tratamiento en otras facilidades. Los casos dudosos han de ser inmediatamente referidos, pues una tardanza irrazonable puede representar el menoscabo sustancial en la salud del paciente o su eventual fallecimiento.

Evidentemente, el tiempo que transcurre desde que un paciente solicita ayuda hasta que se emite y ejecuta la decisión de referirlo a un especialista o a un hospital mejor equipado es esencial; puede representar la diferencia entre la vida y la muerte. A fin de cuentas, este "deber jurídico mayor" implica el reconocimiento de que un segmento de nuestra población carece de los recursos y conocimientos para acudir directamente a un médico especialista o a un hospital privado.

En última instancia, muchos enfermos dependerán del buen juicio y del *quantum* de diligencia que puedan desplegar los médicos de estos centros de salud locales. En este sentido, en materia de impericia médica (*malpractice*), el concepto de referimientos cobra un significado singular y justifica la norma de exigir un alto grado de cuidado al personal médico y auxiliar de estos centros de salud. Con esta realidad en mente, expongamos los hechos.

## II

La prueba revela que para el 6 de julio de 1976, el infante José no presentaba síntomas de tener problemas de salud. Ingería bien sus alimentos. No obstante, durante la mañana del otro día —7 de julio— su madre Iris se percató de que estaba enfermo: tenía

fiebre alta y se mostraba menos activo que de costumbre. Por esta razón, a la 1:00 P.M. lo llevó al Centro de Salud de Vega Alta. Allí fue informada de que esperara por el médico de turno, Dr. Ramón Urbáez, que a la sazón almorzaba. Después de este galeno atender a otro niño, finalmente a las 3:00 P.M. procedió a examinarlo. Como resultado anotó en el récord:

Al examen oído normal, ligero enrojecimiento de garganta. *A la auscultación pulmones algunos estertores roncos en ambos campos pulmonares*. Se ordena tratamiento de *emergencia* y se observará. (Énfasis suplido.) Apéndice 41: *Progress Notes.*

El doctor Urbáez prescribió *dieta líquida*, baños de alcohol, supositorios de aspirina, Albatemp (tempra) líquido, Eritrocin en suspensión, 200 mg., 1 cucharadita cada 6 horas. Además, ordenó "chequear temperatura *constante*". No hizo anotación alguna en torno al posible diagnóstico. Ello de inmediato creó un vacío. Caben dos (2) alternativas. Nos inclinamos a inferir que sospechó pulmonía al ordenar tratamiento de *emergencia*. Sin embargo, observamos que el tratamiento ordenado era el recomendable en casos de faringitis *leve* y para reducir la fiebre. Ciertamente no era *apropiado* para atender y combatir una pulmonía, condición que requería un tratamiento agresivo, con fuertes dosis de penicilina intramuscular.

Iniciado el tratamiento, a las 4:30 P.M., dicho galeno anotó que había comenzado a bajar la temperatura. Indicó que se continuara el tratamiento y la observación. Recomendó *referir* al médico de guardia "en caso necesario".

Esa tarde y noche, José permaneció en una cama del centro, principalmente bajo la vigilancia de su madre, quien se mantuvo a su lado todo el tiempo. El récord de las enfermeras revela que a pesar de las aspirinas y los baños de alcohol la fiebre, aunque intermitente —máximo 39.5 grados y mínima 38°C— nunca desapareció.

Ningún otro facultativo volvió a examinarlo hasta que el doctor Urbáez lo vio la mañana siguiente, a las 8:30 A.M. Según su madre, durante la noche el niño no pudo ingerir alimento. En lugar de la dieta líquida ordenada, el personal del Centro de Salud

le suplió alimentos sólidos —papas y pollo— los cuales rechazó. No se le dio a tomar agua, jugo u otro líquido. Tampoco se le administró suero. No durmió nada. Esa mañana tenía temperatura de 39.5°C, tratada con baños de alcohol.

Después, a las 2:30 P.M., el médico lo evaluó. Anotó "paciente tranquilo" con temperatura de 38.2°C. Lo vio nuevamente a las 4:30 P.M. y mostraba la misma temperatura. Su nota es muy orientadora: "continuar tratamiento, avisar médicos de guardia, evaluar y *referir en caso necesario.*" (Énfasis suplido.) E.N.P., pág. 18.

Subsiguientemente, su madre lo observó intranquilo, con dificultad para respirar e informó a la enfermera. Ésta confirmó que tenía 40°C de temperatura y advirtió al médico de turno, doctor Vergés. Éste lo auscultó y lo *refirió* entonces a Pediatría del Centro Médico, Río Piedras, indicando la fiebre que tenía, que "presentó convulsiones, taquicardia, estertores y que no ha mejorado con el tratamiento". E.N.P., pág. 19. Diagnosticó tentativamente *"Bronquitis Aguda"*.

Fue trasladado en ambulancia con sus padres. Durante el trayecto no recibió oxígeno, suero ni ninguna atención del personal médico o paramédico.

Por vía de *paréntesis*, debemos enfatizar que mientras José estuvo en el Centro de Salud de Vega Alta no se le administró suero o alimentación. Por no existir facilidades, no se le hicieron análisis de sangre u otros exámenes de laboratorio. Tampoco se le tomaron radiografías. No se le hizo el más rudimentario examen neurológico, esto es, comprobar manualmente si existía rigidez en la nuca.

Al arribar al Hospital Universitario, se iniciaron agresivamente una serie de pruebas, análisis, radiografías y exámenes. Se le inyectaron tres (3) clases de antibióticos. Por su condición de deshidratación (moderada-severa) se le administraron sueros. Se le suplió oxígeno y oportunamente se le colocó en un "pulmón artificial". Este tratamiento de excelencia en el Hospital Universitario fue infructuoso. El niño murió a las 5:00 P.M. del 9 de julio de 1976.

En el primer certificado de autopsia, la patóloga Yocasta Brugal certificó como causa de la muerte: "Bronchopneumonía, Sepsis." Notificados el Estado y Municipio de que se entablaría una reclamación, después de presentada la demanda y luego de transcurridos dos (2) años del fallecimiento, se expidió el 6 de julio de 1978 un *nuevo certificado* de defunción que enmendaba el anterior. En éste se le atribuyó la muerte a "Bronchopneumonía, Sepsis, debido a *Polio Bulbar*". (Énfasis suplido.) Cabe destacar que la frase "Polio Bulbar" aparece insertada a manuscrito; el resto está en maquinilla.

Ante el Tribunal Superior, Sala de Bayamón, sus padres Pagán-Class demandaron al Estado y al Municipio de Vega Alta. Trabada la contienda, oportunamente dicho foro (Hon. José F. Rodríguez Rivera, Juez) descartó negligencia. Se fundamentó en el último certificado, la declaración de la patóloga forense Dra. Rosa E. Fiol Rodríguez, un estudio del tejido cerebral del cadáver y el testimonio del perito Dr. Raúl López Correa. Concluyó que la muerte de José se debió a una poliomelitis y que era inexorable.

### III

Erró. Una aclaración inicial. Nos preocupa seriamente que este Foro apelativo siga adjudicando casos de esta naturaleza sobre la base de la premisa de que existe una "presunción" de que un médico ejerce un grado razonable de cuidado en el tratamiento de sus pacientes. *Rodríguez Crespo v. Hernández*, 121 D.P.R. 639 (1988); *Rosado Rosado v. E.L.A.*, 108 D.P.R. 789 (1979). Al hacerlo, continúa arrastrando un grave error evidenciario que acarrea repetidas injusticias. *No existe tal presunción.* La norma jurídica correcta ha sido malinterpretada. De la obligación que tiene todo reclamante de probar su caso mediante "preponderancia de prueba" —*Zambrana v. Hospital Santo Asilo de Damas*, 109 D.P.R. 517, 521–522 (1980); *Cruz v. Centro Médico de P.R.*, 113 D.P.R. 719, 744 (1983)— incluso activando la doctrina de *res ipsa loquitur*, se ha arribado a semejante presunción mediante un salto cuya lógica no alcanzamos a entender.

Ahora bien, la insistencia mayoritaria en seguir resolviendo fundamentado en esa cuestionable presunción no altera la conclusión de que, en el caso de autos, el análisis integral de la prueba demuestra que el personal médico y paramédico del Centro de Salud de Vega Alta incurrió en negligencia en varios extremos. Ante el cuadro clínico inicial que presentaba este infante (pulmonía bilateral severa), era menester una mejor atención y un tratamiento más agresivo de antibióticos. Si a ello unimos la ausencia de facilidades para realizar radiografías y otros análisis, no cabe otra conclusión que la de sostener que los médicos que lo atendieron incurrieron en una tardanza irrazonable en referirlo al Centro Médico.

Estos simples hechos configuran negligencia médica crasa. No estamos ante un error de juicio médico honesto e informado que exime de responsabilidad. Tampoco ante un diagnóstico o tratamiento sobre un cuadro en que las autoridades médicas están en desacuerdo en cuanto a cuál es el diagnóstico o tratamiento más adecuado o cuándo el médico ha seguido una práctica aceptada por la profesión médica. Nos explicamos.

*Primero*, no comprendemos cómo el doctor Urbáez no sospechó pulmonía, puesto que los estertores roncos en ambos campos pulmonares del infante José así lo sugerían. Si efectivamente no lo sospechó, habría que imponerle responsabilidad, pues no estamos ante un "error de juicio fundado", sino ante negligencia crasa. Por el contrario, si lo sospechó —aun cuando no lo indicó en el récord— debió referir al niño inmediatamente a un hospital donde pudiera verificarse ese diagnóstico mediante pruebas de laboratorio y radiografías de pecho. *Bajo cualesquiera hipótesis fue negligente.*

*Segundo*, el antibiótico eritromicina, en la dosis recetada y por la vía oral, si bien podía ser efectivo contra una faringitis *leve*, no lo era contra una pulmonía. Esta última condición justificaba aplicar antibiótico en dosis "masivas" y mediante inyecciones.

*Tercero*, conjuntamente con ese tratamiento agresivo de antibióticos, se imponía trasladarlo a un hospital donde pudieran atenderlo adecuadamente y que, adicionalmente, le suministraran

sueros y, de ser necesario, oxígeno. Hemos visto que estas facilidades no existían en el Centro de Salud de Vega Alta.

*Cuarto*, José había sido vacunado contra la polio. Para el día 6 de julio de 1976 no se notaba enfermo. El cuadro clínico que presentaba no era típico de polio y ninguna otra persona en el área se le había diagnosticado polio.

*Quinto*, aun asumiendo que desarrolló polio, la prueba refleja que la mayor parte de los casos se salvan. En poliomelitis bulbar, el promedio de supervivencia es de un mínimo de cincuenta por ciento (50%). La diferencia entre sobrevivir y morir estriba en la forma en que se atienden las complicaciones incidentales al polio, entre ellas la pulmonía. Muchas veces lo fatal no es el polio, sino esas complicaciones secundarias no tratadas adecuadamente.

Mientras más rápido se apliquen esos tratamientos, mayores son las probabilidades de salvarse. *En el caso de autos, no hay duda de que lo que le causó la muerte al niño fue la pulmonía, según confirmado en la autopsia.* Las treinta (30) horas durante las cuales el niño no recibió tratamiento adecuado en Vega Alta redujeron sustancialmente sus probabilidades de sobrevivir.

*Sexto*, la condición de deshidratación por falta de líquidos (sueros) le afectó considerablemente. Por todos es conocido que la deshidratación es particularmente peligrosa en niños de corta edad.

Y *séptimo*, el tratamiento y atención que se le dispensó en el Hospital Universitario fueron adecuados. Lógicamente, mientras más rápido los hubiese recibido, mayores hubiesen sido sus probabilidades de sobrevivir.

La sentencia del tribunal de instancia y de este Foro descansan en la tesis de que el polio causó la muerte. Esa condición no fue debidamente probada. La doctora Fiol Rodríguez aceptó que no pudo identificar el virus del polio en las laminillas de tejido. E.N.P., pág. 8. La doctora Brugal atestó que no podía decir que el virus era polio. *Fue enfática en que el niño tenía pulmonía bilateral.* "Cuando los ruidos a la auscultación hacen sospechar pulmonía, tomar radiografías. *Era mandatorio*". E.N.P., pág. 28. Y, finalmente, el doctor López Correa aclaró que "los hallazgos del

protocolo de autopsia *no son suficientes* para decir que el niño fue atacado por el virus que produce el polio bulbar *porque no se identificó el virus*". E.N.P., pág. 24.

A la luz de lo expuesto, no podemos sostener que el doctor Urbáez hizo "un esfuerzo honesto y concienzudo para enterarse de los síntomas del menor". Todos los indicadores señalaban poderosamente hacia una pulmonía. Si como afirma la mayoría del Tribunal —descansando en el testimonio del doctor López Correa— la condición del niño "no sugería que la enfermedad fuese de gravedad" (opinión mayoritaria, pág. 544), ¿por qué entonces el doctor Urbáez ordenó tratamiento de *emergencia*?

## IV

Recapitulando. Se probó negligencia al: (a) omitir todo diagnóstico tentativo o final con relación a la condición del niño; (b) ante síntomas altamente sugestivos de una pulmonía, no se procuró inmediatamente tratamiento para ello; (c) no se llevaron a cabo ni gestionaron en algún laboratorio u hospital cercano las pruebas mínimas necesarias para diagnosticar y atender tal condición o diferenciarla en cuanto a otras enfermedades; (d) no se le brindó al niño el cuidado, la atención, la alimentación y la hidratación necesarias; (e) se le trasladó al Centro Médico sin ninguna clase de supervisión paramédica, y (f) se esperó irrazonablemente a que el niño comenzara a convulsar para referirlo tardíamente a dicho Centro Médico.

Corresponde a los tribunales, a través de la aplicación correcta de la normativa jurídica y en virtud de una estimativa psicojudicial pragmática resolver justicieramente controversias de este género. La manida frase "error de juicio honesto e infundado" no tiene cabida en este caso. Revocaríamos.