JOSÉ J. HERNÁNDEZ RIVERA y OTROS, demandantes y recurridos, *v.* MUNICIPIO DE BAYAMÓN y OTROS, demandados y recurrentes.

*Número:* RE-89-681        *Resuelto:* 11 de mayo de 1994

*Guillermo Silva Janer*, abogado de los recurrentes; *José A. Bravo Abreu*, abogado de los recurridos.

## SENTENCIA

Desde aproximadamente las 6:00 de la mañana del día 4 de diciembre de 1984, la joven de catorce (14) años de edad Luz Zenaida Hernández López[1] tenía síntomas de náuseas, vómitos, fiebre y dolor abdominal. Al mediodía sus padres, Juan José Hernández Rivera y Haydeé López

---

[1] Luz Zenaida, según el testimonio de su padre, era una joven saludable, buena hija y cursaba el noveno grado en la escuela Cacique Agüeybaná de la Urb. Sierra Bayamón. E.N.P., pág. 45.

Colón,([2]) decidieron llevar a su hija al Centro de Salud de Bayamón para que fuera examinada y recibiera la atención médica necesaria para aliviarle sus padecimientos.

Según refleja el récord médico de la referida institución hospitalaria, Luz Zenaida fue atendida a las 12:32 de la tarde por la Dra. Vilma Pagán. Surge del récord que la joven acudió a la sala de emergencia del hospital por dolor abdominal y vómitos que comenzaron en la mañana; que no tenía molestia antes de orinar; que hacía dos (2) meses le sucedió algo parecido antes de comenzar la menstruación y que su último período menstrual fue el 4 de noviembre de 1984. Los signos vitales en dicha hoja hacen constar una lectura de la presión arterial de 110/90. Sin embargo, cabe aclarar que dicha lectura aparece tachada y que encima de ésta hay una lectura de 70/50, tomada en ambos brazos. El pulso consta como ochenta (80), la respiración veinte (20), la temperatura en 37°C y el peso de ciento cuatro (104) libras. A su vez, revela que sus pulmones estaban claros y que estaba alerta, su corazón estaba rítmico y que no tenía soplo. Según los resultados del laboratorio, el CBC([3]) salió normal, por lo tanto, el número de células rojas y blancas en la sangre eran normales. También surge del récord que en el laboratorio de ese día hay un urinálisis que indica ser igual o mayor de 1.030 de gravedad específica en la orina; el hospital interpretó dicho hallazgo como

---

([2]) Para el mes de diciembre de 1984, el señor Hernández se encontraba pensionado por incapacidad y la señora López era ama de casa. Éstos tenían dos (2) hijos además de Luz Zenaida, a saber, Juan y Josué Hernández López.

([3]) El "Recuento Sanguíneo Completo" (*complete blood count*) es una "[d]eterminación cuantitativa de los elementos formes de la sangre. Es una de las pruebas de laboratorio más útiles y practicadas. Puede hacerse manualmente, tiñendo la extensión de sangre en una cámara y contando los glóbulos rojos y blancos al microscopio, o usando un contador electrónico. Las plaquetas son más pequeñas y, por lo tanto, más difíciles de contar en un aparato y su recuento se realiza manualmente. El examen microscópico de la sangre se utiliza con el objeto de estudiar la morfología de los elementos formes y descubrir alteraciones en la misma. Los diferentes tipos de glóbulos blancos se representan como porcentajes del total; a esto se lo denomina fórmula leucocitaria. Muchos aparatos de contaje celular dan también el hematócrito o la hemoglobina, incluyéndose en el informe del recuento sanguíneo". *Enciclopedia de Medicina y Enfermería Mosby*, Barcelona, Grupo Editorial Océano, 1992, Vol. 3.

normal. Según el testimonio del perito de la parte demandante, doctor Ramírez Vázquez, del récord *no surge un diagnóstico diferencial*[4] (E.N.P., pág. 2), como tampoco surge si se le dio algún tipo de tratamiento o medicamento. Tampoco aparece en esa hoja que se instruyera a los padres sobre cómo proceder con la paciente. Ese mismo día la joven fue dada de alta en condición estable.

Debido a que la menor al día siguiente, 5 de diciembre de 1984, continuaba con los mismos síntomas de vómitos y se sentía decaída, sus padres decidieron llevarla nuevamente al Centro de Salud de Bayamón. Luz Zenaida fue atendida a las 3:30 de la tarde; siendo examinada, esta vez, por el Dr. Radamés Castellón. En el récord se hace constar que se trata de una paciente femenina de catorce (14) años que presenta náuseas y vómitos. Se anota presión arterial de 80/60, temperatura de 38°C y *no se hace anotación alguna en cuanto a pulso, respiración o peso. No aparece que se ordenaran laboratorios a la paciente. Se hace un diagnóstico de síndrome viral agudo y no se hace constar un diagnóstico diferencial.* Se le receta Fenergan de 50mg. y Anaprox,[5] una (1) tableta cada seis (6) horas. Se indica una condición estable al momento de darla de alta a las 3:50 de la tarde, esto es, veinte minutos después de la hora de llegada.

En la madrugada del 6 de diciembre de 1984, como los síntomas continuaban, los padres de Luz Zenaida la llevaron, *una vez más*, al Centro de Salud de Bayamón. Se le llenó una nueva hoja de récord y fue atendida, en esta ocasión, por el Dr. Manuel Morales, médico asistente, bajo la

---

(4) El diagnóstico diferencial es el "diagnóstico de un estado patológico cuyos signos y síntomas están compartidos por otros estados patológicos semejantes". *Diccionario Médico Teide*, Editorial Teide, España, 1988.

"La doctrina de diagnóstico diferencial ... está basada en la exigencia de un procedimiento para distinguir entre posibles padecimientos que requieren tratamientos diferentes y específicos." *Lozada v. E.L.A.*, 116 D.P.R. 202, 217 (1985).

(5) Según el testimonio del perito de la parte demandante, doctor Ramírez Vázquez, el Anaprox es un medicamento *contra indicado* para un paciente con naúseas y vómitos. E.N.P., pág. 7.

supervisión del Dr. Carlos Santiago Solano.([6]) En el historial se hace constar que había *vomitado seis (6) veces en ese día y que llevaba tres (3) días con vómitos*; se indica que se mareaba con frecuencia; se hace constar presión de 100/60, temperatura de 36.8°C, peso de ciento veintitrés *(123) libras*([7]) y *no se consigna nada en cuanto al pulso y a la respiración*. Se señala, en adición, que la mucosa labial estaba reseca y que la paciente tenía cuatro (4) días de atraso en la menstruación. *Se hace constar un diagnóstico de deshidratación leve*. Según la opinión de ambos peritos —de la parte demandante y la demandada— en esta ocasión no se ordenó un laboratorio para conocer el balance electrolítico de la paciente.([8]) E.N.P., págs. 10 y 41.

El Dr. Carlos Santiago Solano *hospitalizó* a la paciente *y ordenó que se le administrasen*: 500cc de Travert II en un período de cuatro (4) horas; a continuación 500cc de dextrosa en agua al 5% en un período de seis (6) horas; y luego administrarle 500cc de solución salina normal al 0.9% en cinco (5) horas. *No obstante, surge del récord que estos fluidos se administraron en forma inversa*; se comenzó por ad-

---

([6]) Como práctica y costumbre en el Centro de Salud de Bayamón se archivaban todas las hojas del récord de cada día en el *Récord Room*. E.N.P., pág. 37. Por lo tanto, cuando el doctor Castellón examinó a la menor el día 5 de diciembre, éste no tuvo el beneficio de informarse de los hallazgos que aparecían en el récord preparado por la doctora Pagán el día anterior. A su vez, los doctores Morales y Santiago Solano no se informaron de lo que aparecía en el récord para los días 4 y 5 de diciembre de 1984.

([7]) En opinión de los peritos doctores Ramírez Vázquez y Malaret, hay una discrepancia en el peso que se anota ese día con el anotado el día 4 de diciembre de 1984 de ciento cuatro (104) libras. Ambos concurren que esa diferencia en peso es imposible y obviamente se trata de un error.

([8]) El balance electrolítico, o nivel sérico electrolítico, "significa la concentración de los diversos iones (sódico, *potasio*, cloro, bicarbonato, etc.) en la sangre circulante. La concentración de los diversos electrólitos puede alterarse por enfermedades en las que se pierden (vómito y diarrea) o se acumulan al no excretarse (como la insuficiencia renal). *La disminución importante de la concentración electrolítica se puede corregir mediante la administración de los correspondientes electrólitos por la boca o por el goteo endovenoso*. El exceso de electrólitos puede resolverse mediante la extracción de los mismos por diálisis o por resinas especiales en el intestino ingeridas por boca o administradas por enema". (Énfasis suplido.) *Diccionario Médico Teide*, ante.

ministrarle los 500cc de dextrosa en agua al 5% y nunca se administró el Travert II o la solución salina.

A eso de las 9:30 de la mañana del 6 de diciembre de 1984, la temperatura de la paciente era de 37°C, el pulso de 70 y la presión arterial de 140/80. Alrededor de las 10:50 de la mañana, la paciente comenzó a quejarse de dificultad respiratoria y se le ordenó una radiografía de pecho. Su madre la condujo al Departamento de Radiología y cuando le estaban haciendo el estudio, la paciente sufrió un mareo y se cayó al piso. *Los peritos están de acuerdo que en ese momento desarrolló un paro cardiorespiratorio.* Se le dio tratamiento de resucitación cardiopulmonar y la paciente fue referida al Hospital Regional de Bayamón, llegando al mismo alrededor de las 12:25 de la tarde, *pero ya, aparentemente, estaba muerta.* Se le procedió a dar resucitación cardiopulmonar sin éxito y fue declarada muerta un tiempo más tarde.

Se efectuó una *autopsia* por la Dra. Yocasta Brugal que señala *que la causa de la muerte fue una pancarditis.*([9]) A su vez, se señala que entre los hallazgos *post mortem* se encontró el cerebro con marcada palidez; el corazón infiltrado monocelular en epicardio,([10]) miocardio([11]) y endocardio;([12]) los pulmones con congestión y edema([13]) (moderado)

---

([9]) *Pancarditis* es un "[p]roceso anormal caracterizado por la inflamación del corazón en su totalidad; es decir, endocardio, miocardio y pericardio". *Enciclopedia de Medicina y Enfermería Mosby*, ante.

([10]) El *epicardio* es la "capa más externa de la pared cardíaca que rodea al miocardio. Es una membrana serosa que forma la capa más interna de la serosa pericárdica". *Diccionario Médico Teide*, ante.

([11]) El *miocardio* es la "capa media de las tres que forman la pared del corazón. Se compone de músculo cardíaco y forma la mayor parte de la pared cardíaca, siendo más gruesa en el ventrículo que en la aurícula". *Diccionario Médico Teide*, ante.

([12]) El *endocardio* es una "membrana delicada formada por una capa de células endoteliales planas que reviste el corazón y se continúa con el tejido de las arterias y venas. En los orificios de las cavidades cardíacas el endocardio se repliega sobre sí mismo para formar las valvas de las válvulas. Presenta una superficie lisa y viscosa que no dificulta la corriente sanguínea". *Diccionario Médico Teide*, ante.

([13]) *Edema* es la "acumulación excesiva de líquido en los tejidos corporales: popularmente conocida como hidropesía". *Diccionario Médico Teide*, ante.

y el estómago con gastritis([14]).

En vista de lo ocurrido, los padres y hermanos de Luz Zenaida radicaron acción en daños y perjuicios contra el Municipio de Bayamón, el día 11 de julio de 1985, ante el Tribunal Superior de Puerto Rico, Sala de Bayamón. Alegaron, en síntesis, haber sufrido daños([15]) como consecuencia de la negligencia e impericia médica del Centro de Salud de Bayamón, administrado por el Municipio de Bayamón. En específico, alegaron que el personal médico del Centro de Salud de Bayamón incurrió en mala práctica de la medicina al no haberle éste brindado a la niña el mejor tratamiento que su condición física requería y al no haber remitido a dicha paciente, con suficiente antelación, al Hospital Regional de Bayamón.

Luego del correspondiente descubrimiento de prueba, la vista en su fondo del caso se celebró durante los días 3 y 4 de noviembre de 1988. Luego de aquilatar la prueba, el tribunal de instancia dictó sentencia, el 15 de noviembre de 1989, a favor de los demandantes y en contra del Municipio de Bayamón. En dicha sentencia condenó al Municipio de Bayamón a satisfacer, a cada uno de los padres demandantes, Juan José Hernández Rivera y Haydeé López Colón, la suma de sesenta y cinco mil dólares ($65,000) en resarcimiento por la pérdida de la esperanza razonable de alimentos y beneficios futuros y los sufrimientos y angus-

---

([14]) *Gastritis* es la "inflamación del revestimiento (mucosa) del estómago". *Diccionario Médico Teide*, ante.

([15]) Entre los daños alegados, los demandantes dispusieron "que la menor Luz Zenaida Hernández era una niña saludable, buena estudiante de un hogar humilde pero estable y con un potencial de desarrollo intelectual apropiado, poseyendo además los otros factores de familia, comunidad, escolaridad y otros que ha establecido el Tribunal Supremo de Puerto Rico como requisitos básicos para reclamar ingresos futuros que hubiese tenido dicha menor de no haber muerto". Solicitud de revisión, *Exhibit* III, pág. 40. Estimaron esta pérdida de ingresos potenciales en quinientos mil dólares ($500,000).

A su vez reclamaron por sufrimientos y angustias mentales las siguientes cantidades: (a) José Hernández Rivera, cuatrocientos mil dólares ($400,000); (b) Haydée López Colón, cuatrocientos mil dólares ($400,000); (c) Juan Hernández López, doscientos mil dólares ($200,000) y (d) Josué Hernández López, doscientos mil dólares ($200,000).

tias mentales padecidos a consecuencia del fallecimiento de su hija Luz Zenaida. A su vez, condenó al Municipio de Bayamón a satisfacerle, a cada hermano demandante, Juan Hernández López y Josué Hernández López, la suma de cinco mil dólares ($5,000), como compensación razonable por el sufrimiento y las angustias mentales padecidas a consecuencia de la muerte de su hermana. Por otro lado, condenó al referido Municipio a satisfacer la suma de cinco mil dólares ($5,000) en concepto de honorarios de abogado, más intereses al tipo legal sobre la cuantía de la sentencia desde su fecha y las costas.

De esta sentencia, el demandado recurrente, Municipio de Bayamón, acudió en revisión ante este Tribunal, el día 18 de diciembre de 1989, imputándole al foro de instancia haber errado

> ... al considerar que la miocarditis desarrollada por la joven Luz Zenaida Hernández era una no fulminante y que la misma pudo ser superada con tratamiento de restablecimiento adecuado.
> ... al establecer que la causa eficiente de la muerte de la menor Luz Zenaida Hernández fue el alegado tratamiento inadecuado por el personal médico del Municipio de Bayamón, a pesar que la prueba pericial incontrovertida estableció que para la condición de miocarditis y/o pancarditis viral aguda no existe tratamiento efectivo alguno y que el desenlace fatal es una probabilidad independiente del tratamiento médico recibido.
> ... al condenar al Municipio de Bayamón al pago de la suma de $5,000 por concepto de pago de honorarios de abogados, en contravención a las disposiciones de la Regla 44.3 de Procedimiento Civil y el caso de *Colondres Vélez* vs. *Bayrón Vélez*, 144 DPR 822 (1983).
> ... al conceder compensación por pérdida de alimentos futuros no alegados y/o sobre los cuales no pasó evidencia ante el Tribunal de Instancia.
> ... al conceder compensación por sufrimientos y angustias mentales a un niño de cuatro años de edad. Solicitud de revisión, págs. 4–5.

El 25 de enero de 1990, y a los fines de evaluar el recurso de revisión, instruimos a la parte demandada recurrente para "que en el término de sesenta (60) días elev[ara

a] este Tribunal, debidamente certificada por el tribunal de instancia, la exposición narrativa de la prueba ...". Resolución de 25 de enero de 1990. Luego de varias prórrogas concedidas, se radicó ante nos la Exposición Narrativa de la Prueba el 14 de septiembre de 1990. Evaluada la misma, el 9 de noviembre de 1990 expedimos el auto de revisión radicado. Luego de haber comparecido las partes y estando en posición de resolver el caso de autos, procedemos a así hacerlo.

I

Nuestro derecho vigente exige que los hospitales ejerzan el cuidado y las medidas previsoras que un hombre prudente y razonable desplegaría ante determinadas circunstancias y que ofrezcan a sus pacientes la atención médica que su condición requiera. *Márquez Vega v. Martínez Rosado*, 116 D.P.R. 397 (1985); *Crespo v. H.R. Psychiatric Hosp., Inc.*, 114 D.P.R. 796, 800 (1983); *López v. Hosp. Presbiteriano, Inc.*, 107 D.P.R. 197 (1978); *Oliveros v. Abréu*, 101 D.P.R. 209, 228 (1973); *Hernández v. La Capital*, 81 D.P.R. 1031, 1037–1038 (1960). "Para determinar cuál ha de ser esta atención, puede servir de índice la práctica generalmente reconocida por la propia profesión médica." *Crespo v. H.R. Psychiatric Hosp., Inc.*, ante, pág. 800.

Las instituciones hospitalarias operan, y llevan a cabo su labor de servicio a sus pacientes, a través del personal médico, y paramédico, que labora en las mismas. En relación con esta situación, en *Núñez v. Cintrón*, 115 D.P.R. 598, 613–614 (1984), expresamos:

En virtud del Art. 1803 del Código Civil —31 L.P.R.A. sec. 5142— equivalente a la responsabilidad vicaria, el incumplimiento de ese deber por el personal del hospital conlleva responsabilidad extracontractual de la institución hospitalaria frente al perjudicado. *Roses* v. *Juliá*, 67 D.P.R. 518 (1947). Ese enfoque se impone con mayor énfasis en las Salas de Emergencia. "El concepto emergencia denota una combinación

de circunstancias que necesariamente requieren un inmediato curso de acción o remedio. ... Conlleva acción rápida en evitación de la muerte del lesionado o grave complicación a su salud." *Márquez Alfonso* v. *F.S.E.*, 105 D.P.R. 322, 328 (1976).

A estos efectos, y conforme a la norma mínima de atención médica vigente en nuestra jurisdicción, se espera que el médico ofrezca a su paciente aquella atención médica, cuidado, destrezas y protección que, *a la luz de los modernos medios de comunicación y enseñanza y conforme al estado de conocimiento de las ciencias médicas*, satisface las exigencias generalmente reconocidas por la propia profesión médica. *Ramos, Escobales v. García, González*, 134 D.P.R. 969 (1993); *Medina Santiago v. Vélez*, 120 D.P.R. 380, 384 (1988); *Ríos Ruiz v. Mark*, 119 D.P.R. 816 (1987); *Oliveros v. Abréu*, ante; Brau, *Los daños y perjuicios extracontractuales en Puerto Rico*, San Juan, Pubs. JTS, 1986, pág. 248.

En los casos de, alegada, impericia médica la parte demandante viene en la obligación de establecer, mediante preponderancia de la prueba, que el tratamiento médico ofrecido por el demandado, o la ausencia de proveer el tratamiento indicado y correcto, fue el factor que con mayor probabilidad ocasionó el daño sufrido por el paciente. *Rodríguez Crespo v. Hernández*, 121 D.P.R. 639, 650 (1988); *Ríos Ruiz v. Mark*, ante; *Cruz v. Centro Médico de P.R.*, 113 D.P.R. 719, 744 (1983); *Zambrana v. Hospital Santo Asilo de Damas*, 109 D.P.R. 517, 521 (1980). Debe mantenerse presente, en adición, que la relación de causalidad, entre el daño y el acto negligente, *no* se establece a base de una mera especulación o conjetura. *Ramos, Escobales v. García, González*, ante, pág. 976.

La correcta solución del presente caso depende principalmente, como prácticamente todos los casos de impericia médica, de la apreciación y peso que se le brinde, por el foro judicial, al testimonio pericial que tuvieren a bien presentar las partes. Es por ello que resulta pertinente reiterar que constituye norma trillada que en relación con la

apreciación de la prueba pericial, este Tribunal se encuentra en iguales condiciones que el tribunal de instancia y en libertad de adoptar su propio criterio. Como expresáramos, en *Prieto v. Maryland Casualty Co.*, 98 D.P.R. 594, 623 (1970):

> Consistentemente hemos resuelto que ningún tribunal está obligado a seguir indefectiblemente la opinión, juicio, conclusión o determinación de un perito o facultativo, sobre todo cuando está en conflicto con testimonios de otros peritos *y que todo tribunal está en plena libertad de adoptar su criterio propio en la apreciación o evaluación de la prueba pericial y hasta descartar la misma aunque resulte ser técnicamente correcta.* (Énfasis suplido.)[16]

Por último, conviene recordar que es norma reiterada en nuestra jurisprudencia que "[a]l cumplir con nuestra función revisora en casos de impericia médica, nuestra decisión debe estar fundada en la prueba vertida en el juicio por los peritos y la prueba documental. En ausencia de prueba no es nuestra función establecer a este nivel apelativo los elementos requeridos por el Art. 1802 del Código Civil, *supra*. De lo contrario, cedemos a la tentación de sustituir el criterio de los peritos médicos por el nuestro, según un estudio apelativo de la literatura disponible". (Énfasis en el original.) *Ríos Ruiz v. Mark*, ante, págs. 821-822.

## II

Comenzamos nuestro análisis con el testimonio del Dr. José Rafael Ramírez Vázquez,[17] quien testificó ante el tribunal de instancia como perito de la parte demandante.

---

[16] Véanse, en adición: *Zambrana v. Hospital Santo Asilo de Damas*, 109 D.P.R. 517, 521 (1980); *Alonso García v. Comisión Industrial*, 103 D.P.R. 712, 714-715 (1975); *Valldejuli Rodríguez v. A.A.A.*, 99 D.P.R. 917, 921 (1971); *Concepción Guzmán v. A.F.F.*, 92 D.P.R. 488 (1965); *Pereira v. E.L.A.*, 91 D.P.R. 750 (1965).

[17] El doctor Ramírez Vázquez es especialista en medicina interna con una sub-especialidad en inmunología.

Conforme su testimonio, un paciente que padece de vómitos por varios días corre el peligro de deshidratarse. En el caso de Luz Zenaida, la deshidratación quedó demostrada por el resultado del urinálisis, el cual reveló una gravedad específica de 1.030, que está sobre el límite, debiendo interpretarse que su riñón había comenzado a compensar la pérdida de líquido. E.N.P., pág. 3. La deshidratación, según el testimonio de este perito, puede convertirse en un desbalance electrolítico que "puede resultar en desbalance fatal o en daño al paciente. Puede causar su muerte. Definitivamente la deshidratación es una de las causas más comunes de arritmias letales. Es la alcalósis metabólica o hipocalemia, porque se encuentra en la pérdida de volumen por vómito. Hipocalemia es una baja de potasio". E.N.P., pág. 5. Según el testimonio del doctor Ramírez Vázquez, para el día 5 de diciembre ya Luz Zenaida padecía de deshidratación leve y lo indicado era tratar la misma; no surge del récord evidencia de que así se hiciera. Dentro del tratamiento, era necesario establecer el balance electrolítico a través de un examen de laboratorio e hidratar a la paciente con líquido intravenoso que contenga sal y potasio.[18] E.N.P., pág. 7. *De no hacerse esto, la hipocalemia puede culminar en una taquicardia ventricular que frecuentemente cambia a fibrilación ventricular.*[19] El doc-

---

[18] El doctor Santiago Solano, médico del Centro de Salud que atendió a la joven Luz Zenaida Hernández López *y quien testificó como "perito de ocurrencia" y no como testigo perito,* declaró al respecto que no se ordenó un laboratorio de electrolitos, el día 5 de diciembre de 1984, porque en el Centro de Salud en cuestión no existía la máquina necesaria. El doctor Santiago Solano "[c]ree que no es completamente necesario hacerlo para manejar una deshidratación leve. Los pediatras manejan deshidratación leves o moderadas sin necesidad de electrólitos en nuestro centro. Sencillamente es una calse [sic] médica indigente que acude al Centro de Salud de Bayamón y los médicos no pueden ordenar el laboratorio de electrólitos por ser costoso. Estima que cuesta $95.00 y eso es algo que para una deshidratación leve, teniendo conciencia de la condición social del paciente no se ordena". E.N.P., pág. 35. A su vez, el doctor Santiago admitió que a la paciente en ese momento no se le mandó ni siquiera a la máquina de CBC para hacer un examen de sangre y orina porque la misma no funciona de noche.

[19] La fribilación ventricular causa que el corazón deje de latir (paro cardíaco); suele ser casi siempre la consecuencia de un infarto del miocardio. *Diccionario Teide,* ante.

tor Ramírez Vázquez declaró que, independientemente de que se supiese o no que la paciente tuviera una miocarditis o una pancarditis, *él entendía que el tratamiento que se ofreció para corregir el desbalance electrolítico y el volumen intravascular fue deficiente.* Esto contribuyó a una irritabilidad cardíaca y a una arritmia letal. E.N.P., pág. 20. De ahí que el doctor Ramírez concluye que la causa de la muerte fue la arritmia letal que se llama pericardio ventricular que desarrolló fibrilación ventricular. *Él no niega que la paciente tuviese pancarditis. En su opinión, la patóloga forense que realizó la autopsia no consideró estas otras causas concurrentes con la muerte.* Las mismas no aparecen del informe, pero según su criterio se revelan del expediente clínico. E.N.P., pág. 24.

La parte demandada presentó, como perito médico, al Dr. Germán Malaret.[20] Éste declaró *que la paciente desarrolló una miocarditis de carácter fulminante, causado por un virus incubado por la paciente para el que no existe tratamiento médico específico.* E.N.P., pág. 39. Según dicho facultativo, *lo único que se podía hacer en este tipo de caso era dar tratamiento de sostén al paciente con la esperanza de que el propio cuerpo humano se recuperara de la infección.*[21] De acuerdo con el criterio médico del doctor Malaret, *en esta condición es prácticamente imposible la recuperación y hay un alto grado de mortalidad.* De acuerdo con su opinión, *el paciente habría de fallecer de cualquier manera dada su condición aguda de miocarditis viral.* E.N.P., pág. 40.

En la repregunta al doctor Malaret, éste aceptó que el cuadro de síntomas de la paciente el 4 de diciembre de 1984 era sugestivo de una *ligera deshidratación.* E.N.P., pág. 43. Coincide con el doctor Ramírez que en esa fecha debió haberse considerado, como un diagnóstico diferen-

---

[20] El doctor Malaret es especialista en medicina interna y cardiología.

[21] Véase tercer párrafo de la página 3 del Informe del doctor Malaret de 20 de octubre de 1986, incorporado al recurso de revisión ante este Foro como *Exhibit* VII.

cial, la gastritis. En relación al día 5 de diciembre de 1984, *éste acepta* que de él haber sido el médico hubiera ordenado unos laboratorios y hubiese retenido a la paciente hasta saber el resultado de los laboratorios. *También acepta* que debieron haberse hecho unos laboratorios sobre electrolitos. E.N.P., pág. 43. Fue más allá al decir que, de no tener el hospital la maquinaria, se podía sacar la sangre para enviarla a un laboratorio independiente que hiciera el análisis de electrolitos. Fue categórico al decir que eso es lo que se hace cuando el médico tiene sospechas de que se hayan afectado los electrolitos. E.N.P., pág. 44. A su vez, el doctor Malaret admitió en la repregunta que de haber existido en la paciente una hipocalemia, esa condición podía provocar arritmias de corazón. E.N.P., pág. 43. Añadió que el músculo del corazón para su mejor funcionamiento tiene que tener un flujo de minerales como potasio y un desbalance electrolítico afecta el corazón y es lo que provoca la arritmia. E.N.P., pág. 45.

## III

A la luz de lo antes expuesto, somos del criterio que resulta forzosa la conclusión de que erró el tribunal de instancia al estimar que la parte demandada le responde a la parte demandante *por la muerte* de la joven Luz Zenaida Hernández López. El balance más racional, justiciero y jurídico de la totalidad de la evidencia que desfilara ante el foro de instancia —en específico, de la prueba pericial— *a nuestro juicio demuestra que, desafortunadamente, la muerte de la joven Hernández López era inevitable.* Véase *Ramos Acosta v. Caparra Dairy, Inc.*, 113 D.P.R. 357, 364 (1982). Ello en vista del hecho de que ésta fue *víctima de una miocarditis, o pancarditis, de carácter fulminante que le causó la muerte y para la cual condición no existe tratamiento médico específico*; determinación o condición que encuentra apoyo no sólo en el testimonio del perito doctor

Malaret sino que en la autopsia practicada a dicha infortunada joven, según ello surge del protocolo suscrito por la patóloga forense que realizó la misma.

El testimonio del doctor Ramírez Vázquez, a los efectos que la causa de la muerte de esta joven fue una "arritmia letal", es uno especulativo y poco confiable. Conforme el mismo, la joven se deshidrató. Ello le causó un desbalance electrolítico; situación que no fue advertida por los médicos del Centro de Salud debido a que no contaban con el equipo para hacer los análisis y laboratorios necesarios.(22) Ello, conforme el testimonio del doctor Ramírez Vázquez, *le pudo causar* una arritmia letal a la joven, lo cual, según su opinión médica, *le pudo causar* la muerte.

Es correcto que hemos resuelto que, en esta clase de casos, *no* es necesario que el demandante demuestre una "única y exacta causa de daño". Ello no obstante, esa misma jurisprudencia sí le exige al actor que demuestre, mediante la preponderancia de la evidencia, que la *conducta negligente* del demandado "fue el *factor* que *con mayor probabilidad*" causó el daño. *Núñez v. Cintrón*, ante, pág. 617. *Ese requisito no fue satisfecho en el presente caso por la parte demandante.* Se cometieron, en consecuencia, por el tribunal de instancia los primeros dos errores señalados por la parte demandada recurrente.(23)

---

(22) En *Lozada v. E.L.A.*, 116 D.P.R. 202, 213 (1985), expresamos:

"Aunque aspiramos al ideal de excelencia en la práctica de la medicina, la determinación de lo que constituye negligencia, por la posesión o carencia de determinado equipo, necesariamente se nutre de diversos factores. Esta fórmula se explica, porque al "fijar la norma debemos y queremos ser justos y razonables. No vamos a exigir requisitos y condiciones que hagan imposible la práctica de la medicina en Puerto Rico o que hagan económicamente prohibitivos los servicios médicos". *Oliveros v. Abréu*, 101 D.P.R. 209, 226 (1973).

"Para evaluar en el caso de autos si existía el deber del Estado de poseer un equipo de arteriografía en el Departamento de Urología del Hospital Regional —que es la premisa cardinal en que basó el foro de instancia la responsabilidad— como lugar donde se realizaban biopsias renales, *debemos considerar ese deber configurado en el contexto de la figura de la previsibilidad, y el elemento rector que la complementa: la razonabilidad.* Esta a su vez se nutre de factores adicionales tales como onerosidad, apremio, recursos, y sobre todo, el reconocimiento y aceptación de alternativas por la profesión médica." (Énfasis suplido y en el original.)

(23) Ello hace innecesario la consideración, y discusión, de los restantes errores.

Por las razones antes expresadas, *se dicta sentencia revocatoria de la emitida por el Tribunal Superior de Puerto Rico, Sala de Bayamón.*

Así lo pronunció, manda el Tribunal y certifica el señor Secretario General. El Juez Asociado Señor Negrón García emitió una opinión disidente. El Juez Asociado Señor Alonso Alonso disintió sin opinión escrita. Los Jueces Asociados Señores Hernández Denton y Fuster Berlingeri no intervinieron.

(*Fdo.*) Francisco R. Agrait Lladó
*Secretario General*

**– O –**

Opinión disidente del Juez Asociado Señor Negrón García.

No podemos ser meros espectadores de este lamentable drama de la vida real. "Como veremos, al levantarse el telón —más que normas jurídicas frías— aparece la dolorosa realidad de aquello que todo el mundo sabe pero que intenta ignorar: *las diferencias entre la medicina pública para los pobres y la privada.*" (Énfasis suplido.) *Martínez Cruz v. E.L.A.*, 126 D.P.R. 170, 171 (1990).

I

El 4 de diciembre de 1984 Luz Zenaida Hernández López, joven de catorce (14) años, amaneció con náuseas, vómitos, fiebre y dolor abdominal. Sus padres Juan J. Hernández Rivera y Haydeé López Colón la llevaron al Centro de Salud de Bayamón. Fue atendida por la Dra. Vilma Pagán. La lectura del pulso reflejó ochenta (80), la temperatura 37°C, el peso ciento cuatro (104) libras y la respiración veinte (20). Se le practicó un urinálisis que indicó ser igual o mayor de 1.030 de gravedad específica en la orina. Mientras le realizaban el examen médico, su presión varió

de 110/90 a 70/50, esta última tomada en ambos brazos. Del récord médico no surge un diagnóstico diferencial, sólo "síndrome premenstrual". No hay constancia de que se instruyera a sus padres cómo atenderla en caso de que los síntomas continuaran.

Al día siguiente, en horas de la tarde, la llevaron nuevamente al Centro de Salud; sufría vómitos y náuseas. Se anotó una presión arterial 80/60 y temperatura de 38°C. No se hizo anotación en cuanto a pulso, respiración o peso. En esta ocasión se le diagnosticó "síndrome viral agudo"; nuevamente sin haberse hecho un diagnóstico diferencial. Aunque Luz Zenaida llevaba treinta y seis (36) horas sufriendo estos padecimientos, se le recetó "Anaprox". No se le ordenaron laboratorios a pesar de que persistían todos los síntomas. Fue dada de alta escasamente veinte (20) minutos más tarde, lo cual demuestra que su examen fue apresurado y superficial.

El 6 de diciembre, a las 2:10 de la madrugada, los padres regresaron por tercera vez con Luz Zenaida al Centro de Salud. Apenas podía sostenerse en pie y necesitó el apoyo paterno para caminar hasta la Sala de Emergencia. Tampoco le ordenaron laboratorios, en específico, para conocer su balance electrolítico. El examen físico reveló que las mucosas labiales estaban resecas. E.N.P., pág. 2. El Dr. Carlos Santiago decidió hospitalizarla y ordenó que le administraran 500cc. de Travert II en un período de cuatro (4) horas; luego 500cc. de dextrosa en agua al cinco por ciento (5%) en seis (6) horas, y después 500cc. de solución salina normal al cero punto nueve por ciento (0.9%) en cinco (5) horas. Del récord surge que sólo le administraron los 500cc. de dextrosa en agua al cinco por ciento (5%); nunca el Travert II ni la solución salina. Tampoco le administraron potasio en el suero, mineral necesario para evitar la inflamación del miocardio. La prueba revela que con los "500cc de Dextrosa en agua no se adelantaba gran cosa porque el líquido que ella recibía de esa forma no va al sitio

que tiene que ir y se distribuye en todo el cuerpo en vez de ir a la sangre que es donde necesita la concentración salina". E.N.P., pág. 11. Posteriormente se le administró Fenergán veinticinco (25) miligramos intramuscular.(¹)

A las 10:50 de la mañana Luz Zenaida se quejó de dificultad al respirar(²) y se le ordenó una radiografía del pecho. Su madre la llevó al salón de radiología. Mientras le tomaban las radiografías, Luz Zenaida se mareó y cayó al piso; sufrió un paro cardiorespiratorio. Se le dio tratamiento de resucitación cardiopulmonar para estabilizarla, le inyectaron azúcar, adrenalina, bicarbonato y xylocaina, y la refirieron al Hospital Regional de Bayamón; cuando llegó, a las 12:25 de la tarde, estaba muerta. En el récord médico no aparece que le hubiesen tomado los signos vitales luego de que sufriera el paro cardiorespiratorio. Aún así, se desprende que el médico describió que el corazón estaba rítmico y los "pulmones claros". Además, hay una nota que dice "presión 0, pulso 0, corazón no late y pulmones claros". Según el criterio del perito Dr. José R. Ramírez Vázquez, lo último es imposible porque ya en ese momento la paciente había sufrido un fallo cardiorespiratorio. A su juicio, también es inexplicable la nota que dice "abdomen blando, depresivo y no doloroso", puesto que la paciente ya estaba clínicamente muerta y no podía informar si sentía dolor. E.N.P., págs. 13–14.

De la prueba presentada "surge un diagnóstico de 'Rull Out' (sic) añadido y un D.I. 'urinal tractor (sic) infection'. El Dr. Ramírez señala que no sabe de dónde salió esta última anotación porque no surge de los laboratorios ni del

---

(¹) Según la prueba pericial de los demandantes Hernández López, el "récord refleja una información confusa en cuanto a la administración del fenergán 25 miligramos intramuscular. Da la impresión que se le administra en dos ocasiones, a las 9:00 y a las 11:00, pero el récord del día 7 indica que a las 10:30 la paciente había tenido unos eventos. Por eso el Dr. Ramírez dice que no sabe cómo interpretar esas notas. Esto es una nota que aparece a las 7:30 de la noche". E.N.P., pág. 12.

(²) De acuerdo con el doctor Ramírez, la "[d]ificultad respiratoria en un cuadro clínico de una paciente es un cambio significativo puesto que es uno de los signos vitales, o sea, la respiración hay que atenderla contra la vida continuada y que es uno de los signos que debe cuidar". E.N.P., pág. 12.

récord. En opinión del Dr. Ramírez eso le hace pensar que se hizo retrospectivamente para documentar un examen físico, antes que el paciente se enviara a Rayos X". E.N.P., pág. 13.

La prueba pericial indica que un electrocardiograma practicado luego del episodio en el salón de radiología demostró una taquicardia ventricular[3] que cambió a fibrilación ventricular,[4] la cual aparentemente no respondió a cardioversión.[5] La autopsia preparada por la Dra. Yocasta Brugal identifica que la causa de la muerte fue una pancarditis.[6]

Los padres y hermanos de Luz Zenaida demandaron en daños y perjuicios por alegada impericia profesional de los facultativos del Centro de Salud de Bayamón. Previo los trámites de rigor, el Tribunal Superior, Sala de Bayamón (Hon. Juan José Ríos Martínez, Juez), declaró con lugar la demanda y ordenó el pago de $65,000 a cada progenitor por

---

[3] *Taquicardia ventricular* es una "[v]ariedad de alteración del ritmo caracterizado, en el electrocardiograma, por la sucesión rápida y casi regular, con cadencia media de 140 a 200 por minuto de complejos ventriculares atípicos que asemejan extrasístoles ventriculares; son gobernados por uno o dos focos ventriculares ectópicos. El ritmo auricular, disociado, es más lento (70 a 80 por minuto). La *t.v.* es por lo general de pronóstico muy grave; aparece sobre todo en la fase aguda del infarto de miocardio o en la fase terminal de las cardiopatías crónicas. Si no se reduce rápidamente (el tratamiento de elección es el choque eléctrico) sobreviene por lo general la muerte por fibrilación ventricular y parada cardíaca. Las *t.v.* idiopáticas y benignas son más raras. V. taquicardia ventricular lenta y reentrada". M. Garnier y V. Delamare, *Diccionario de los Términos Técnicos de la Medicina*, 20ma ed., Madrid, Eds. Norma, 1981, pág. 1028.

[4] La *fibrilación ventricular* es una fibrilación cardíaca que alcanza los ventrículos. Se define como "[t]remulación desordenada de las fibras musculares cardiacas que da a la pared del corazón el aspecto del hormigueo de un paquete de gusanos. Produce la parálisis de las cavidades cardiacas interesadas, incapaces de contracciones coordinadas; se limita ordinariamente a las aurículas *(fibrilación auricular)*; provoca la arritmia de los ventrículos (arritmia completa). Si alcanza los ventrículos *(fibrilación ventricular)*, produce muy rápidamente la muerte por paro cardíaco (v. este término)". (Énfasis en el original.) Garnier y Delamare, *op. cit.*, pág. 405.

[5] *Cardioversión* es el "[r]establecimiento del ritmo cardiaco normal por medio de un choque eléctrico externo. V. desfibrilador y lesfibrilación". Garnier y Delamare, *op. cit.*, pág. 146.

[6] *Pancarditis* es una "[i]nflamación del endocardio, del miocardio y del pericardio. Se observa en general en el curso del reumatismo poliarticular agudo y puede provocar un extraordinario aumento del volumen del corazón ... y presentar una evolución grave ...." Garnier y Delamare, *op. cit.*, pág. 745.

la pérdida de la esperanza razonable de alimentos, beneficios futuros y los sufrimientos y angustias mentales. Además, indemnizó en $5,000 a cada uno de sus hermanos, más $5,000 en honorarios de abogados y las costas. No conformes, el Municipio de Bayamón, administrador del Centro de Salud, presentó esta revisión.

## II

El testimonio del perito de los demandantes, doctor Ramírez Vázquez —con especialidad en medicina interna y una subespecialidad en inmunología y enfermedades inmunes— fue a los efectos de que los síntomas que presentaba Luz Zenaida cuando originalmente acudió al Centro de Salud eran más compatibles con un problema gastrointestinal agudo, de tipo gastritis o gastroenteritis,[7] que con

---

[7] La *gastroenteritis* es "un término genérico que a menudo implica una etiología inespecífica, desconocida o no aclarada. Sin embargo, determinadas enfermedades de etiología bacteriana, vírica, parasitaria o tóxica conocida, pueden incluirse en la definición clínica. Cuando es posible identificar una etiología específica puede evitarse el término menos específico (gastroenteritis). Para algunos tipos de gastroenteritis bacteriana (p. ej., cólera, salmonelosis y shigelosis) hay mecanismos patogénicos establecidos, y estos casos pueden considerarse prototipos para otros síndromes de menor especificidad.

"El carácter y gravedad de los síntomas dependen de la naturaleza y de la dosis del irritante, de la duración de su acción, de la resistencia del paciente y del grado de afectación. GI. El inicio es a menudo súbito y a veces muy florido, con anorexia, náuseas o vómitos, borborigmos, espasmos abdominales y diarrea, con emisión de sangre y moco o sin ella. Puede acompañarse, de malestar, dolores musculares y postración.

"Los vómitos y la diarrea persistentes determinan una grave deshidratación y shock, con colapso vascular e insuficiencia renal oligúrica. Si los vómitos causan una pérdida de líquido excesiva, se produce alcalosis metabólica con hipocloremia. Si la diarrea es más prominente, es más probable que aparezca acidosis. Los vómitos y la diarrea excesiva pueden producir hipopotasemia. Puede aparecer también hiponatremia, particularmente si se utilizan líquidos sin electrólitos en el tratamiento de reposición. La deshidratación grave y el equilibrio acidobásico pueden producir cefalea y síntomas de irritabilidad muscular y nerviosa."

Finalmente, el tratamiento aconsejado incluye: "el reposo en cama con un acceso conveniente a un baño cómodo o a la utilización de una cuña. Cuando las náuseas o los vómitos son leves o ya han finalizado, se toman líquidos como té endulzado caliente, bebida carbonatada, sol. de glucosa y electrólitos p.o. (v. Diarrea, cap. 56), caldo colado, cereales, gachas o caldos con sal. Mientras hay vómitos no debe tomarse nada p.o. Si los vómitos son persistentes o la deshidratación es importante, son necesarias las perfusiones i.v. de suero glucosado al 5%, junto con la adecuada repo-

un síndrome premenstrual. Destacó que la presión 70/50 es baja y que, junto con el historial de náuseas y vómitos, indicaba un estado de deshidratación severa. Atestó que el resultado de 1.030 del urinálisis debió interpretarse como que el riñón había empezado a compensar la pérdida de líquidos significativos. *"Es decir, que Luz Zenaida ha perdido aproximadamente de unos 5 a 10% de su volumen intracorporal y el riñón empieza a concentrar la orina para tratar de retener líquido a su máxima capacidad."* Opinó que aunque en el récord aparece anotado que la paciente estaba en condición *estable, "los síntomas presentados tienden a sostener un desbalance electrolítico que debe cuantificarse con la correspondiente prueba de electrólitos".* Señaló que la administración de Anaprox[8] estaba contraindicada puesto que, como medicamento irritante similar a la aspirina, podía empeorar la gastritis o gastroenteritis. A su mejor entender, debió recetársele un medicamento para controlar los vómitos y canalizarle una vena para reemplazarle el volumen de líquido. *Además, debieron hospitalizarla para observarla y administrarle líquidos, ya que no podía ingerir alimentos por su estado de vómitos.*

Por otro lado, atestiguó que la deshidratación es una de las causas más comunes de arritmias letales cuando la pérdida de volumen por vómito causa alcalosis metabólica o hipocaliemia.[9]

---

sición electrolítica. El ejemplo más notable, en el que se comenta con detalle el papel de la fluidoterapia en la gastroenteritis, es el de cólera agudo (v. Cólera, cap. 8). En otros casos se aplican principios similares. En los casos graves, cuando se produce un shock está indicada la administración de sangre o expansores del plasma." *El Manual Merck*, 8va ed., 1989, págs. 870–872.

[8] *Anaprox* es un analgésico antinflamatorio que contiene 275 mg. de *naproxen sodium*. Su uso es indicado para el alivio de dolores ligeros y moderados, y para el tratamiento de dismenorrea primaria. También está indicado su uso para diferentes tipos de artritis, tendinitis, bursitis y gota aguda. *Physician's Desk Reference*, 1990, pág. 2185.

[9] Declaró que la *hipocaliémia* es una baja en potasio que se produce por un desbalance electrolítico y que la presencia de este desbalance electrolítico aumenta la irritabilidad de cualquier condición cardíaca y puede ser fatal. E.N.P., pág. 10. Clínicamente se define como "[d]isminución de la tasa del potasio en la sangre.

Explicó que para la segunda visita, el 5 de diciembre, Luz Zenaida llevaba treinta y seis (36) horas con vómitos, fiebre y presión baja. Este cuadro clínico "est[aba] diciendo gastroenteritis". Sin embargo, en el récord no aparece tal diagnóstico. Por el contrario, aparece uno poco específico de "síndrome viral agudo". Según su conocimiento, síndrome viral "es lo que se llama 'waist basket'. Ese diagnóstico es propio de cuando uno no sabe lo que tiene la paciente ...". E.N.P., pág. 7. A su entender, para esa fecha ya había un marcado signo estabólico o hipocaliemia. Debieron ordenarse exámenes de laboratorio para conocer la severidad del desbalance electrolítico. Además, declaró que de habérsele hecho un electrocardiograma a la paciente, *cuando fue ingresada por última vez al hospital,* hubiese podido diagnosticársele la condición de hipocaliemia.

En síntesis, el testimonio del doctor Ramírez Vázquez, que mereció entero crédito al ilustrado tribunal sentenciador, sostiene que al existir un desbalance de electrólitos en el cuerpo y continuar los vómitos, la pérdida de potasio pudo haber causado una hipocaliemia que culminó en una taquicardia ventricular y fibrilación ventricular.[10]

Por otro lado, los demandados presentaron el testimonio pericial del Dr. Germán Malaret, especialista en medicina interna y cardiología. Su teoría fue que Luz Zenaida padecía de un síndrome viral, desarrolló una miocarditis aguda fulminante,[11] la cual provocó una taquicardia ventricular y esto fue seguido de su muerte. Según declaró, no existe

Puede ser provocada por pérdidas de potasio por vía digestiva (vómitos, diarrea) o por una modificación de la reabsorción tubular del potasio, de origen renal o corticosuprarrenal". Garnier y Delamare, *op. cit.,* págs. 510–511.

*Sobre sus efectos en el corazón* enfatizamos que "la hipocaliemia grave puede producir contracciones ventriculares y auriculares prematuras y taquiarritmias ventriculares y auriculares, así como trastornos de la conducción auriculoventricular en pacientes que no reciben digital. En presencia de tratamiento con digital se producen alteraciones similares con grados menores de hipocaliemia". *El Manual Merck,* 8va ed., 1989, págs. 1080–1081.

[10] Esta teoría quedó debidamente confirmada por el tratadista citado en su testimonio. Véase, Harrison, *Internal Medicine,* 7ma ed., pág. 1127. E.N.P., pág. 13.

[11] *Miocarditis* es el "[n]ombre genérico de todas las inflamaciones del miocardio". Garnier y Delamare, *op. cit.,* pág. 659.

tratamiento específico para una miocarditis o pancarditis viral aguda y el conocimiento de la pancarditis en la paciente se obtiene al hacerse su autopsia por la Dra. Yocasta Brugal.

Hoy la mayoría del Tribunal acoge su teoría y revoca. Al así hacerlo, justifican el tratamiento negligente administrado a Luz Zenaida durante sus tres (3) visitas al Centro de Salud. Concluyen que la muerte de Luz Zenaida era inevitable, ya que "fue víctima de una miocarditis, o pancarditis, de carácter fulminante que le causó la muerte y para la cual condición no existe tratamiento médico específico...". En recta juridicidad y justicia, no podemos seguir esa ruta decisoria.

### III

"La miocarditis o la pericarditis en los niños mayores o los adultos también puede deberse a un virus Coxsackie del Grupo B y, en algunos casos, a uno del Grupo A o a un virus ECHO. Los síntomas y signos suelen localizarse sólo en el miocardio o pericardio, y *la recuperación completa es habitual.*

El diagnóstico se establece, como en otras infecciones por virus Coxsackie, por el aislamiento del virus o por estudios del título de anticuerpos. El tratamiento es asintomático, incluso el reposo estricto en cama y el control de la insuficiencia cardíaca y de las arritmias. No se ha establecido el valor de los corticoides cuyo uso es mejor reservarlo para los casos de miocarditis con insuficiencia cardíaca asociada." (Enfasis suplido.) *El Manual Merck*, 8va ed., 1989, pág. 245.

Como vemos, resulta claro que existe tratamiento adecuado para los casos de miocarditis. Interesantemente, el testimonio del doctor Malaret sigue la misma teoría de "miocarditis viral fulminante aguda" que expresara en el juicio de *Martínez Cruz v. E.L.A.*, supra. Allí, en ocasión del

---

De la autopsia practicada por la Dra. Yocasta Brugal no surge que la condición fuese "fulminante". Además, resulta interesante notar que ninguno de los peritos coincidió con que la pancarditis viral fue la causa de la muerte tal y como lo concluyó la patóloga, doctora Brugal, en su autopsia. [001a]

contrainterrogatorio, "aceptó que la muerte por *miocarditis viral es la excepción*". (Énfasis en el original.) Íd., pág. 117.

Ahora bien, arguendo que la condición de Luz Zenaida no fuera curable, es irrefutable que el diagnóstico efectuado y el posterior tratamiento que se le brindó en sus tres (3) visitas al Centro de Salud fueron deficientes, erróneos y claramente negligentes. Ante lo que era un cuadro claro de deshidratación aguda, no se tomaron las medidas necesarias para sustituir los fluidos de su cuerpo. Tampoco se ordenaron ni practicaron las pruebas de laboratorio para detectar el aparente desbalance electrolítico en la joven Luz Zenaida. Todo esto *agudizó su condición viral* y, a tenor con el testimonio del doctor Ramírez Vázquez, causó que se produjera la condición de miocarditis o pancarditis que, eventualmente, le causó la muerte.

Estos hechos cumplen con los elementos constitutivos de una causa de acción de negligencia médica bajo el Art. 1802 de nuestro Código Civil, 31 L.P.R.A. sec. 5141, a saber, un daño; su relación causal con la acción u omisión del demandado, que fue por su culpa o negligencia. *Ramos, Escobales v. García, González*, 134 D.P.R. 969 (1993); *Rivera Jiménez v. Garrido & Co., Inc.*, 134 D.P.R. 840 (1993); *Defendini Collazo et al. v. E.L.A., Cotto*, 134 D.P.R. 28 (1993); *J.A.D.M. v. Centro Com. Plaza Carolina*, 132 D.P.R. 785 (1993); *Torres Maldonado v. J.C. Penney Co.*, 130 D.P.R. 546 (1992); *García Pagán v. Shiley Caribbean, etc.*, 122 D.P.R. 193 (1988); *Riley v. Rodríguez de Pacheco*, 119 D.P.R. 762 (1987); *Soc. Gananciales v. G. Padín Co., Inc.*, 117 D.P.R. 94 (1986); *Jiménez v. Pelegrina Espinet*, 112 D.P.R. 700, 703 (1982); *Gierbolini v. Employers Fire Ins. Co.*, 104 D.P.R. 853 (1976).

En casos de impericia médica es exigible aquella norma mínima que a la luz de los modernos medios de comunicación y enseñanza, y conforme al estado de conocimiento de la ciencia y la práctica prevaleciente de la medicina, satis-

face las exigencias generalmente reconocidas por la profesión. *Castro Ortiz v. Mun. de Carolina*, 134 D.P.R. 783 (1993); *Pagán Rivera v. Mun. de Vega Alta*, 127 D.P.R. 538 (1990); *Pérez Torres v. Bladuell Ramos*, 120 D.P.R. 295 (1988); *Medina Santiago v. Vélez*, 120 D.P.R. 380 (1988); *Riley v. Rodríguez de Pacheco*, supra, pág. 797; *Ríos Ruiz v. Mark*, 119 D.P.R. 816, 820 (1987); *Negrón v. Municipio de San Juan*, 107 D.P.R. 375, 377 (1978). El demandante debe demostrar, mediante preponderancia de la prueba, que la conducta negligente del demandado fue el factor que con *mayor probabilidad* lo causó. *Castro Ortiz v. Mun. de Carolina*, supra; *Pagán Rivera v. Mun. de Vega Alta*, supra; *Torres Ortiz v. Plá*, 123 D.P.R. 637 (1989); *Rodríguez Crespo v. Hernández*, 121 D.P.R. 639 (1988); *Cruz v. Centro Médico de P.R.*, 113 D.P.R. 719, 745 (1983); *Pérez Cruz v. Hosp. La Concepción*, 115 D.P.R. 721, 740 (1984).

En relación con la responsabilidad de los hospitales, reiteradamente hemos establecido que éste debe brindar al paciente aquel grado de cuidado que ejercería un hombre prudente y razonable en condiciones y circunstancias similares. *Márquez Vega v. Martínez Rosado*, 116 D.P.R. 397, 405 (1985); *Núñez v. Cintrón*, 115 D.P.R. 598, 613 (1984); *Crespo v. H.R. Psychiatric Hosp., Inc.*, 114 D.P.R. 796, 800 (1983).

Luz Zenaida llegó al Centro de Salud con síntomas que, según el perito doctor Ramírez Vázquez, reflejaban un cuadro de gastroenteritis. Los facultativos, fundamentándose en un diagnóstico rápido y superficial, no le proveyeron el tratamiento adecuado para sustituir la pérdida de líquido a causa de los vómitos. Tampoco le ordenaron laboratorios para determinar la existencia de un desbalance electrolítico. Por el contrario, le diagnosticaron, primero, un "síndrome premenstrual" y, posteriormente, un "síndrome viral agudo". Aunque toda la prueba tiende a demostrar su existencia, no surge evidencia de que la joven sufriera de hipocaliemia. Esto se debe a la omisión negligente

del Centro de Salud al no hacer los laboratorios de rigor que hubiesen arrojado más información sobre tal condición. Concluimos, pues, que los médicos del Centro de Salud incumplieron con el deber de cuidado impuesto por la normativa jurisprudencial; debieron responder.

En Puerto Rico rige la doctrina de la "causalidad adecuada" para determinar la causalidad legal entre la acción u omisión negligente y el daño sufrido. *Soc. Gananciales v. G. Padín Co., Inc.*, supra; *Jiménez v. Pelegrina Espinet*, supra. Ésta postula que " 'no es causa toda condición sin la cual no se hubiera producido el resultado, sino la que ordinariamente lo produce según la experiencia general' ". *Soc. de Gananciales v. Jeronimo Corp.*, 103 D.P.R. 127, 134 (1974).

> Expresa J. Santos Briz en su antes citada obra *La Responsabilidad Civil*, p. 192 y siguientes, que para la doctrina de la adecuación la cuestión a resolver consiste en determinar si la concurrencia del daño era de esperar en la esfera del curso normal de los acontecimientos o si queda fuera de este posible cálculo. Sólo en el primer caso el resultado *es adecuado* a la actuación que lo originó, está en relación con ella y fundamenta el deber de indemnizar. Añade el distinguido autor que la cuestión que esta teoría plantea es determinar si la conducta del individuo es generalmente apropiada para producir un resultado de clase dada y la contestación sólo puede darse previa una valoración objetiva, atendiendo las circunstancias del caso concreto.
>
> Apunta Santos Briz que el efecto de una causa adecuada no cesa porque sucesos posteriores actualicen y renueven su riesgo específico. Estos sucesos no interrumpen la relación causal originaria ni la desplazan por una nueva cadena causal cuando el suceso posterior no ha hecho más que "descubrir" la oculta tendencia favorable a su ocurrencia de la condición primaria. Entendemos el concepto de descubrir en el contexto de acelerar, precipitar, desencadenar y tal vez agravar.
>
> Expresa el autor que bajo la teoría de la adecuación la relación de causa a efecto no se limita a los miembros inmediatos de una cadena causal sino que continúa a través de un número ilimitado de miembros intermedios; pero este nexo causal —físico o natural— no extiende la responsabilidad hasta consecuencias muy alejadas que no pueden ser jurídicamente imputadas al actor. H. Brau del Toro, *Los daños y perjuicios*

*extracontractuales*, San Juan, Pubs. J.T.S., 1986, págs. 699–700.

Según la prueba pericial y documental, la causa adecuada que causó la muerte de Luz Zenaida fue el diagnóstico erróneo y el tratamiento inadecuado que se le proveyó. ¿Puede negarse que de haberse diagnosticado y clínicamente controlado la gastroenteritis viral no se hubiera reducido las posibilidades del desenlace fatal por miocarditis viral? Advertimos que ambos peritos coincidieron que en caso de hipocaliemia ésta hacía más probable la muerte de una paciente con pancarditis o miocarditis.

Coincidimos, pues, con el foro de instancia en que la negligencia de los médicos del Centro de Salud al diagnosticar y luego dar el tratamiento ante la patente deshidratación aguda de Luz Zenaida fue la causa adecuada y determinante que *incrementó* la posibilidad de una muerte por miocarditis o pancarditis.

"La niña le dio la oportunidad a los médicos; los médicos no se la dieron a ella." *Pérez v. E.L.A.*, 95 D.P.R. 745, 752 (1968).